UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CHARLES LITTLE also known as Clifton Little,
also known as Clifton X,

                                        Plaintiff,
                                                            9:19-CV-0263
v.                                                          (TJM/TWD)

TREVAR A. SOULIA, et al.,

                                        Defendants.
_____

APPEARANCES:                            OF COUNSEL:

CHARLES LITTLE
Plaintiff *pro se*
14-A-0447
Washington Correctional Facility
Box 180
72 Lock 11 Lane
Comstock, NY 12821

HON. LETITIA JAMES                      Brian W. Matula, Esq.
New York State Attorney General - Albany     Assistant Attorney General
The Capitol
Albany, NY 12224
Attorney for Defendants

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

        This matter was referred for a Report and Recommendation by the Honorable Thomas J.

McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R.

72.3©).  *Pro se* Plaintiff Charles Little ("Plaintiff" or "Little"), an inmate in the custody of the

New York State Department of Corrections and Community Supervision ("DOCCS"),

commenced this action pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights at Clinton Correctional Facility ("Clinton C.F.") in 2017 and 2018.  (Dkt. No. 53.)

Defendants and claims remaining are: (1) First Amendment free exercise claims against Sergeant B. Mason ("Mason") and Correction Officer J. Deyo ("Deyo"); (2) First Amendment retaliation claim against Deyo; (3) Eighth Amendment excessive force and failure-to-intervene claims against Mason, Correction Officer M. French ("French"), Correction Officer Trevar A. Soulia ("Soulia"), Correction Officer E. Taft ("Taft"), and Correction Officer K. Denny ("Denny"); (4) Eighth Amendment deliberate medical indifference claims against Nurse Shawn Bleau ("Bleau"), Mason, French, Soulia, Taft, and Denny; and (5) Fourteenth Amendment equal protection claims against Mason, French, Soulia, Taft, and Denny.  (Dkt. Nos. 53, 55.)

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking dismissal of the complaint in its entirety.  (Dkt. No. 66.)  Plaintiff filed a response.  (Dkt. No. 76.)  Defendants filed a reply.  (Dkt. No. 79.)

For reasons explained below, the Court recommends that Defendants' motion for summary judgment be granted in part and denied in part.

## I.    BACKGROUND[1]

Plaintiff claims to be registered as a Muslim with DOCCS and an active member/citizen of the Nation of Islam ("N.O.I.").  (Dkt. No. 53 at ¶ 3.)  Plaintiff's religious beliefs mandate that he perform Salat - the act of praying five or more times a day.  (Dkt. No. 66-4 at 19-20.[2])

---

[1] Defendants' statement of material facts largely omits the background of this case presumably because they concede these facts are in dispute.  Unless otherwise noted, the following facts are drawn from Plaintiff's second amended complaint and sworn testimony.

[2] Citations to documents on the docket are to the pages the Court's CM/ECF electronic filing system automatically assigns.  Paragraph references are used where the referenced document contains consecutively

Plaintiff alleges that on May 25, 2017, at approximately 6:45 p.m. he "got up to go to the bathroom" in his cell and saw Officer Soulia at his cell gate. (Dkt. No. 66-4 at 24, 29.) Officer Soulia told Plaintiff "to step away from the toilet [. . . ] I want to see your hands, step away from the toilet, direct order." *Id*. at 24-25. Prior to stepping away from the toilet, Plaintiff attempted to flush the toilet and discovered that it was not working. *Id*. at 25.

According to Plaintiff's version of events, he "backed up to [his] cell gates" and "was leaning" on the bars of the gate. (Dkt. No. 66-4 at 65.) Plaintiff testified that he took a "little step forward" so that the cell gates could open, felt a "little shove" and claims that Soulia "wrap[ped] his hand around [Plaintiff's] neck." *Id*. at 63, 65, 68. Plaintiff testified that he was "tossed" onto the bed and saw "officers coming in." *Id*. at 63-64, 68. Plaintiff claims that Taft, Denny, and French entered his cell and began kicking and punching him in the ribs, face, shoulders, and neck. (Dkt. No. 66-4 at 70-72, 75.) Denny and French "pushed" Taft "out of the way" causing Plaintiff's locker to "knock over" and his asthma pump to fall "towards the toilet." *Id*. at 80. At that time, Mason was at the front of the cell, watching the incident unfold. *Id*. at 71, 77.

Plaintiff testified that he momentarily lost consciousness and when he awoke, he was handcuffed by Taft who "grabbed [him] by the handcuffs and lifted [him] off the ground." (Dkt. No. 66-4 at 73, 78). Taft was "bending" Plaintiff's wrist. *Id*. at 79. Mason then "pulled out the blue gloves," "put[] his hand around [Plaintiff's] throat and start[ed] choking the life out of [Plaintiff]." *Id*. When Mason released his "chokehold", he picked up Plaintiff's asthma pump and threw it in the toilet. *Id*. at 80-81. When Mason attempted to flush the toilet, Plaintiff

---

numbered paragraphs throughout.

overheard French tell Mason that the toilet did not work.  (Dkt. No. 66-4 at 81.)  Mason

responded, "oh yeah, I forgot we did that."  *Id*. at 81.  Mason picked up the asthma pump,

removed the canister, "blew" into the canister, returned it to the case, and said, "hope this works

bud[.]"  *Id*.

The Use of Force Report prepared in connection with the incident, submitted by

Defendants, states that Plaintiff was compliant with directions to stand up and back up to the cell

door.  (Dkt. No. 66-5 at 1.)  Officer Soulia reported that, "as the cell door opened, I witnessed

inmate Little run to the back of his cell toward his toilet."  *Id*.  Soulia described entering the cell

and "grabbing" Plaintiff by "the sweatshirt with both hands" preventing him from throwing an

"unknown item" into the toilet.  *Id*. at 2.  Soulia "used both of [his] arms" to "bear hug" and force

Plaintiff, face first, onto his bed.  *Id*.  Soulia reported that Plaintiff was compliant with directives

to place his hands behind his back thereby "ending the use of force."  (Dkt. No. 66-5 at 2.)

Plaintiff was escorted "to the back of D-Block" by Taft, Soulia, Mason, and French.

(Dkt. No. 66-4 at 82, 84.)  Plaintiff testified that he repeatedly asked for his asthma pump and

Defendants responded with racial slurs.  *Id*. at 85.  Eventually, Soulia gave Plaintiff the pump

and when Plaintiff attempted to use it, the medicine was "not being administered correctly."  *Id*.

at 83.  Soulia took the pump and sprayed the medication into Plaintiff's face.  *Id*.

While the officers escorted Plaintiff to medical, Mason told Plaintiff what to report to

medical.  (Dkt. No. 66-4 at 91.)  Mason warned, "[y]ou're not going to mention anything else."

*Id*. at 94.  Plaintiff did not receive any medical treatment, and was escorted back to his cell.  *Id*. at

105; (Dkt. No. 66-6 at 1.)

An Inmate Injury Report, prepared by the attending nurse, indicates "UOF" as the cause of the inmate's injury.  (Dkt. No. 66-6 at 1.)  According to the report, Plaintiff stated, "[m]y asthma was bothering me and I took my pump a couple of times."  *Id*.  Mason signed the report as the witnessing and reporting employee.  *Id*.

On May 26, 2017, Plaintiff requested emergency sick call for chest pains, bruises to his back, neck, and ribs, swollen eyes, dizziness, and shortness of breath.  (Dkt. No. 66-4 at 39, 105-106.)  Plaintiff was escorted to medical and underwent a visual and physical examination by a nurse.[3]  *Id*. at 106, 110-112, 117.  The nurse used a stethoscope, asked Plaintiff to take deep breaths, made notations in Plaintiff's medical chart, and discussed Plaintiff's asthma and the use of his inhaler.  *Id*. at 109-113.  The nurse also examined Plaintiff's range of motion in his wrists and fingers and used a "thumb tack" to check for numbness.  *Id*. at 110-114.  The nurse directed Plaintiff to go to sick call if he experienced complications.  (Dkt. No. 66-4 at 114.)  Plaintiff was discharged from the infirmary with "twelve Ibuprofens[.]"  *Id*. at 44, 114.

From May 26, 2017, through May 28, 2017, Plaintiff remained in his cell.  (Dkt. No. 66-4 at 45-46.)  During this time, Plaintiff was unable to "make Salat."  *Id*. at 136-137.  On May 28, 2017, at approximately 12:00 p.m., the water in Plaintiff's cell was operating correctly.  *Id*. at 32.

On April 5, 2018, the Office of the Inmate Grievance Program Supervisor received correspondence from Plaintiff with a grievance dated May 29, 2017.  (Dkt. No. 66-13 at ¶ 25.)  In the grievance, Plaintiff reported a "use of force" incident on May 25, 2017, involving Taft, Mason, "and three other John Doe C.O.s" and claimed that Mason was responsible for shutting

---

[3]  Plaintiff claims that he was examined by Nurse Bleau.  (Dkt. No. 66-4 at 105.)  Bleau disputes this fact.  (Dkt. No. 66-21.)

off the water to his cell.  (Dkt. No. 66-20 at 3.)  The grievance was rejected as untimely.  (Dkt. No. 66-13 at ¶¶ 25-26.)

On April 12, 2018, Plaintiff asked to be placed on a "list" for Nation of Islam services. (Dkt. No. 66-4 at 149; Dkt. No. 66-17 at 1.)  Plaintiff went to breakfast and, when he returned, "they announced N.O.I."  (Dkt. No. 66-4 at 149.)  Plaintiff however, was not called and missed one service.  *Id*. at 149, 152.  At lunch time, Plaintiff asked Deyo, "how come I wasn't let out." *Id.*  Plaintiff testified that Deyo responded, "I know about your little grievance with Taft" and "I don't like you black Muslims[.]"  *Id*.

## II.  LEGAL STANDARD GOVERNING SUMMARY JUDGMENT

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin*, 467 F.3d at 273.  In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp*.,

475 U.S. 574, 586 (1986).  "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit has reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).  "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted).  Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Where a party is proceeding pro se, the court is obligated to "read [the pro se party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses.  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (credibility issues which are questions of fact for resolution by a jury, are inappropriately decided by a court on a motion for summary judgment).

## III.    ANALYSIS

Defendants move for judgment as a matter of law and dismissal of all of Plaintiff's allegations.  Defendants argue that Plaintiff's claims must be dismissed on multiple grounds:  (1) failure to exhaust his administrative remedies with regard to his claims arising from incidents that occurred in May 2017; (2) the absence of any evidence from which a reasonable factfinder could conclude that Plaintiff sustained anything other than *de minimis* injuries as a result of alleged "use of force" incident in May 2017; (3) Plaintiff's claims for compensatory damages are barred because Plaintiff suffered *de minimis* injuries; (4) Mason was not personally involved in the decision to shut off Plaintiff's water; (5) Bleau was not personally involved in the alleged constitutional deprivations; (6) Plaintiff's Eighth Amendment deliberate medical indifference claims fail on the merits; (7) the record evidence fails to give rise to a genuine dispute of material fact regarding whether Deyo violated Plaintiff's First Amendment rights; and (8) Plaintiff's Equal Protection claims fail on the merits.  (*See generally* Dkt. No. 66-2.)

### A.    Exhaustion of Administrative Remedies

Defendants argue that the claims related to incidents that occurred in May 2017 must be dismissed because Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA").[4]  (Dkt. No. 66-2 at 5-8.)  In response, Plaintiff argues his administrative remedies were unavailable because his grievance was "unfiled and unanswered."  (Dkt. No. 76-3 at 22.)

---

[4] Defendants do not argue that Plaintiff failed to exhaust his administrative remedy with respect to his First Amendment claims against Deyo and his Fourteenth Amendment equal protection claim against Denny.

8

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (2006). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S. at 93. Because failure to exhaust is an affirmative defense, defendants bear the burden of showing that a plaintiff has failed to exhaust his available administrative remedies.[5] *See Jones*, 549 U.S. at 216.

DOCCS has a well-established three-step administrative review process, Inmate Grievance Program ("IGP"), which oversees the manner in which issues are resolved by affording inmates "an orderly, fair, simple and expeditious method for resolving grievances." 7 N.Y.C.R.R. § 701.1(a). Concerns "about the substance or application of a written or unwritten policy, regulation, procedure or rule of [DOCCS]," as well as complaints of "employee misconduct meant to annoy, intimidate or harm an inmate" may be filed. *Id.* § 701.2(a)-(e).

First, an inmate must file a complaint with the facility's IGP clerk within twenty-one

---

[5] Here, Defendants preserved the exhaustion defense by asserting it in their answer. (Dkt. No. 61 at ¶10.)

calendar days of the alleged occurrence.  7 N.Y.C.R.R. § 701.5(a).  A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue.  *Id*. § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id*. § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing.  *Id*. § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's Superintendent within seven calendar days of receipt of the IGRC's written decision.  7 N.Y.C.R.R. § 701.5(c)(1).  If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the Superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal.  *Id*. § 701.5(c)(3)(ii).

Third, a grievant may appeal to the Central Office Review Committee ("CORC") within seven working days of receipt of the Superintendent's written decision.  7 N.Y.C.R.R. § 701.5(d)(1)(I).  CORC is to render a written decision within thirty calendar days of receipt of the appeal.  *Id*. § 701.5(d)(3)(ii).

The Second Circuit has long recognized this procedure as an "available remedy" for purposes of the PLRA.  *See Hall v. Cty. of Saratoga*, No. 10-CV-1120 (NAM/CFH), 2013 WL 838284, at *1-2 (N.D.N.Y. Mar. 6, 2013).  Generally, if a plaintiff fails to follow each of the required steps prior to commencing an action, he has failed to exhaust his administrative remedies as required under the PLRA.  *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency

holds out, and doing so properly (so that the agency addresses the issues on the merits.") (internal quotation marks, emphasis, and citations omitted)).

Nevertheless, while the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). More specifically, Section 1997e(a) provides only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]") (quotation marks and citations omitted). In the PLRA context, the Supreme Court has determined "availability" means "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks and citations omitted).

There are three circumstances in which a court may find a facility's internal administrative remedies are not available under the PLRA. *Ross,* 136 S.Ct. at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1860.

Here, the parties do not dispute that Clinton C.F. had a grievance program at the relevant time. Christine Gregory ("Gregory"), the IGP Supervisor at Clinton C.F., and Rachel Seguin, the Assistant Director of the DOCCS IGP, submit declarations in support of the summary judgment

11

motion propounding that Plaintiff never filed a grievance at Clinton C.F. concerning any of the claims related to events that occurred in May 2017 and never filed a grievance appeal to CORC. (Dkt. No. 66-13 at ¶ 21; Dkt. No. 66-9 at ¶ 16.)

During his deposition, Plaintiff testified that he handwrote several "copies" of a grievance which contained complaints related to incidents that occurred on May 25, 2017. (Dkt. No. 66-4 at 125-128.) Plaintiff placed the copies in sealed envelopes addressed to various individuals and entities, including the IGRC clerk. *Id.* At the time, Plaintiff was in keeplock and could not access the mailbox next to the officer's desk. *Id.* Therefore, Plaintiff handed the envelopes to Correction Officer Stewart ("Stewart") on May 29, 2017. *Id.* at 129-130. Plaintiff testified that he did not receive a response to his grievance and wrote additional letters to the IGRC. (Dkt. No. 66-4 at 138-139.) At that time, Plaintiff remained in keeplock confinement and therefore, he handed the letters to "a C.O." (Dkt. No. 76-3 at 23.) Plaintiff testified that his letters went unanswered. (Dkt. No. 66-4 at 138-139.)

Gregory avers that she "reviewed the correspondence from 2017" and claims, "there is no correspondence from Plaintiff in 2017" other than an unrelated grievance. (Dkt. No. 66-13 at ¶ 23.)

Plaintiff testified that, in July 2017, Correction Officer Holland told him that his grievance "was thrown out" and "disposed of." (Dkt. No. 66-4 at 134, 140, 143.) Defendants have not submitted affidavits or declarations from Stewart or Holland contradicting Plaintiff's version of events.[6] Plaintiff recognized that, "from that point [. . .] I know why I haven't got a

---

[6] Plaintiff previously asserted constitutional claims against Stewart and Holland that were dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. (Dkt. No. 9.)

response from anybody." *Id*. at 141, 143.  As a result, Plaintiff wrote to Superintendent Bell and

claims he was instructed to re-file the grievance and, on April 3, 2018, Plaintiff wrote to the

IGRC and "re-submitted" his grievance.  *Id*. at 143-144; (Dkt. No. 66-20 at 2.)

Gregory acknowledges that Plaintiff attempted to file a grievance in April 2018, but

explains it was "rejected" as "untimely" received by the grievance office beyond the 21-day

timeline provided for in Directive #4040.  (Dkt. No. 66-20 at 1; Dkt. No. 66-13 at ¶¶ 25-27.)

Citing to Directive 4040, 701.5(a)(1), and 701.6(g)(1)(i)(a), Gregory advised

> . . . your complaint is being returned to you because the dates
> noted in the complaint, 5/25/17, 5/26/17, 5/28/17, are more than
> 21 calendar days ago and in accordance with [ . . . ] section 701.6,
> it is more than 45 days ago and may not be granted.
>
> Per [D]ir. #4040 Section 701.6(g)(1)(ii) "An inmate may pursue
> a complaint that an exception to the time limit was denied by
> filing a separate grievance."

(Dkt. No. 66-20 at 1.)

Upon review of the records maintained in the regular course of business by DOCCS,

Gregory states Plaintiff never filed a subsequent grievance regarding the denial of an exception to

the time limit.  (Dkt. No. 66-13 at ¶ 27.)

Based upon the record, the Court concludes that Plaintiff failed to exhaust his

administrative remedies with respect to his claims that arose from events that occurred in May

2017.  The inquiry therefore turns on whether Plaintiff's administrative remedies were

unavailable.  The Court finds that the question of availability in this case is governed by the

Second Circuit decision in *Williams v. Corr. Officer Priatno*, 829 F.3d 118 (2d Cir. 2016), in

which the Court held that the opacity of 7 N.Y.C.R.R. § 708.1(g) rendered the DOCCS IGP

procedure unavailable to the plaintiff inmate and found that the plaintiff had exhausted his

administrative remedies by giving his grievance to the corrections officer.  As in this case, the

inmate plaintiff in *Williams* claimed to have drafted a grievance complaining of an assault by

corrections officers and given it to a corrections officer for delivery to the IGP office because he

was in restricted confinement.  *Id.* at 120-21.  In *Williams,* the inmate plaintiff never received a

response to the unfiled grievance.  *Id*. at 125.

The Second Circuit acknowledged in *Williams* that under § 701.8(g), an inmate may

appeal a grievance "to the next step" if he does not receive a timely response from the

Superintendent.  *Williams*, 829 F.3d at 124.  The Court concluded, however, that:

> Even if Williams technically could have appealed his grievance, we
> conclude that the regulatory scheme providing for that appeal is "so
> opaque" and "so confusing that . . . no reasonable prisoner can use [it]."
> *Ross*, 136 S.Ct. at 1859 (quoting Tr. of Oral Arg. 23).  The regulations
> simply do not contemplate the situation in which Williams found
> himself, making it practically impossible for him to ascertain whether
> and how he could pursue his grievance.

*Williams*, 829 F.3d at 124.  Accepting Williams' allegation that the officer to whom he had given

the grievance did not file it, the Court found:

> Under that circumstance, the regulations do not adequately outline the
> process to appeal or otherwise exhaust administrative remedies.  On
> their face, the regulations only contemplate appeals of grievances that
> were actually filed.  For example, if the grievance had never been filed,
> the superintendent would never have received it and the timeline for her
> to provide a response within 25 days of "receipt of the grievance" would
> never have been triggered. NYCRR tit. 7, § 701.8(f).  In turn, the textual
> provision allowing a grievant to appeal to the CORC would never have
> come into effect.  *See id.* § 701.8(g) ("If the Superintendent fails to
> respond within the required 25 day calendar day time limit the grievant
> may appeal his/her grievance to CORC.").  Accordingly, the regulations
> give no guidance whatsoever to an inmate whose grievance was never
> filed.

14

*Williams,* 829 F.3d at 124.

Here, Defendants maintain Plaintiff has failed to proffer admissible evidence demonstrating a question of fact as to the availability of the grievance program in 2017.  (Dkt. No. 79 at 7.)   The Court notes that Defendants' briefs in support of summary judgment lack any argument or reference to *Williams* and its applicability, or lack thereof, to this matter.  Rather, in support of their position, Defendants cite to *Pridgen v. Beatie.*  In *Pridgen*, as in this case, Plaintiff failed to exhaust his administrative remedies, but claimed that the grievance process was unavailable because his grievance was "thrown out or otherwise destroyed by corrections officers."  *Pridgen v. Beatie*, No. 9:16-CV-535 (DNH/CFH), 2018 WL 1402049, at *7 (N.D.N.Y. Jan. 17, 2018), *report and recommendation adopted*, 2018 WL 1394146 (N.D.N.Y. Mar. 19, 2018).  The Court concluded that "Plaintiff's accusation that corrections officers discarded his grievance, alone, does not excuse his failure to exhaust."  *Id.*  However, the *Pridgen* case is factually distinguishable from the case at hand.  In *Pridgen*, the plaintiff did not offer any evidence, other than his own testimony, to corroborate his claims.  *Id*. at *8.  In contrast, here, Plaintiff annexed copies of his grievance and letters to the IGRC Supervisor to his pleadings and to his sworn response to Defendants' motion.   (Dkt. No. 76-2 at 42-43; Dkt. No. 76-3 at 1.)

In a letter dated June 17, 2017, Plaintiff asked for a status of the grievance complaint dated May 29, 2017, "that [he] handed to John Doe C.O. working the 3-11 pm tour of duty in D-Block on 5/29/17."  (Dkt. No. 76-2 at 42.)  In a letter dated June 26, 2017, Plaintiff referred to DOCCS' Directive #4040 noted "it fails to mention what actions to take when a grievance has not been filed."  *Id*. at 43.  Plaintiff acknowledged that, "at this time it is untimely and no response has been received by me.  Therefore, I ask that said grievance complaint be appealed to the

Superintendent[.]" *Id*.  In a letter dated July 26, 2017, Plaintiff stated that "[i]t has now been 30 days since said request and being that the Supt. is unresponsive I ask that said grievance be appealed to CORC[.]"  (Dkt. No. 76-3 at 1.)

Here, Plaintiff's testimony and documentary evidence are sufficient, when drawing all reasonable inferences in Plaintiff's favor, "to raise a genuine issue of material fact as to whether the grievance process was 'available.' "  *See Medina v. Napoli*, 725 Fed. App'x 51, 54 (2d Cir. 2018); *McLean v. LaClair*, No. 9:19-CV-1227 (LEK/ATB), 2021 WL 671650, at *8 (N.D.N.Y. Feb. 22, 2021).

Defendants also argue Plaintiff has not demonstrated that his administrative remedies were unavailable because he failed to file a grievance concerning the rejection of his untimely grievance.  (Dkt. No. 79 at 6-7.)  The *Williams* court rejected this argument and held, "even though [. . .] an inmate could file a separate complaint grieving the denial of an exception to the filing deadline, such a grievance would be futile given that the regulations do not give the IGP supervisor authority to grant an exception beyond 45 days of the initial incident." *Williams*, 829 F.3d at 125-26.  Here, by the time the Plaintiff learned from Gregory's memorandum dated April 5, 2018, that no grievances had been filed regarding the assault, not only had the twenty-one day deadline expired, but the forty-five day limit on requesting an extension of time to file a grievance based upon mitigating circumstances had expired as well.  § 701.6(g)(1)(i)(a). Notably absent from Gregory's declaration is any discussion regarding whether she considered mitigating circumstances before rejecting the grievance as untimely.  *See Santos v. Schroeder*, No. 9:19-CV-1610 (LEK/TWD), 2021 WL 931959, at *6 (N.D.N.Y. Feb. 1, 2021), *report and recommendation adopted*, 2021 WL 930709 (N.D.N.Y. Mar. 11, 2021); *but Cf. Ferguson v.*

16

*Mason*, No. 9:19-CV-927 (GLS/ATB), 2021 WL 862070, at *10 (N.D.N.Y. Jan. 7, 2021), *report and recommendation adopted,* 2021 WL 531968 (N.D.N.Y. Feb. 12, 2021) (during exhaustion hearing, the IGP Supervisor who rejected the grievance as untimely testified that she still considered whether the plaintiff offered mitigating circumstances to justify the delay in filing).

In light of *Williams*, the Court finds material issues of fact as to the availability of the grievance process and whether Plaintiff attempted to exhaust his administrative remedies, precluding summary judgment. *See, e.g., Hamlett v. Stotler*, No. 9:17-CV-0939 (GLS/TWD), 2019 WL 4306999, at *9 (N.D.N.Y. Aug. 15, 2019) (holding that the plaintiff's failure to respond to the rejection of his grievances as untimely is "excused under the Second Circuit's decision in *Williams* because the regulations themselves 'give no guidance whatsoever to an inmate' in the plaintiff's position) (citation omitted), *report and recommendation adopted*, 2019 WL 4305443 (N.D.N.Y. Sept. 11, 2019).

Additionally, Defendants' contention that Plaintiff was able to successfully navigate the IGP as to other matters at Clinton C.F. during the relevant time (*see* Dkt. No. 79 at 5) does not necessarily weaken Plaintiff's unavailability argument because his history of filing grievances could also suggest that, absent interference, he was capable of complying with the grievance process. *See Burrell v. Zurek*, No. 9:17-CV-0906 (LEK/TWD), 2019 WL 4051596, at *3 (N.D.N.Y. Aug. 28, 2019).

Thus, the Court recommends that Defendants' motion for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies be denied. *See Fann v. Graham*, No. 9:15-CV-1339 (DNH/CFH), 2018 WL 1399331, at *6 (N.D.N.Y. Jan. 11, 2018) (finding issue of fact as to the availability of administrative remedies where the record suggested

the plaintiff submitted grievances, which were unfiled and unanswered), *report and recommendation adopted by* 2018 WL 1399340 (N.D.N.Y. Mar. 19, 2018); *Thaxton v. Simmons*, No. 10-CV-1318, 2013 WL 4806457, at \*4 (N.D.N.Y. Sept. 9, 2013) ("[A] question of fact exists as to whether [p]laintiff never filed his initial grievance on April 29, as [d]efendants claim, or that, as [p]laintiff claims, he filed a timely grievance that was lost or tampered with by [d]efendants. Such credibility assessments are to be resolved by a trier of fact."); *see also Woodward v. Lytle*, No. 9:16-CV-1174 (NAM/DEP), 2018 WL 4643036, at \*4-5 (N.D.N.Y. Sept. 27, 2018) (finding an issue of fact as to the availability of the grievance process where the plaintiff drafted and submitted a grievance that was never filed or answered) (collecting cases).

### B.    Eighth Amendment Excessive Force Claims

"The Eighth Amendment prohibits the infliction of cruel and unusual punishments . . . including the unnecessary and wanton infliction of pain." *Giffen v. Crispen*, 193 F.3d 89, 91 (2d Cir. 1999) (citation and quotation marks omitted).  An Eighth Amendment excessive force claim has two elements - "one subjective focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992)).

"The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (quoting *Wright*, 554 F.3d at 268) (internal quotation marks omitted).  The test for wantonness on an excessive force claim "is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. " *Id*. (quoting *Scott*

*v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (in determining whether defendants acted maliciously or wantonly, "a court must examine several factors including: the extent of the injury and mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.") (citation and quotation marks omitted)).  The objective component requires a showing that the "conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Harris*, 818 F.3d at 64 (citation omitted).

In this matter, Defendants argue that the excessive force and failure-to-intervene claims should be dismissed because the force and Plaintiff's alleged injuries, if any, were *de minimis*. (Dkt. No. 66-2 at 10.)  Relying upon Plaintiff's deposition testimony and Ambulatory Health Record, Defendants claim that Plaintiff's complaints of chest pains, bruised ribs, neck pain, dizziness, numbness in his fingers, and the feeling that his airways were "very constricted" do not support a constitutional claim.  *Id*. at 10-11.  Defendants also cite to the Use of Force report, prepared by medical staff after the incident, which contains the notation "no injuries noted at this time" in support of the argument that Plaintiff has failed to "provide proof of any injury from the incident alleged ind May 2017."  *Id*. at 9.

Defendants misstate the applicable standard.   The "core judicial inquiry" in an excessive force case is "not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm ." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) (punctuation and citations omitted).  The extent of any injury suffered by the inmate "is one factor that may

19

suggest whether the use of force could plausibly have been thought necessary in a particular situation[.]" *Hudson*, 503 U.S. at 7 (citation and quotation marks omitted); *Wilkins*, 559 U.S. at 37. But "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without grievous injury." *Wilkins*, 559 U.S. at 38. "While the absence of serious injury is certainly a matter that the jury can consider in assessing both the reasonableness of the force and potential damages from any misconduct, a district court should not grant summary judgment on this basis alone." *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 150–51 (2d Cir. 2021).

Here, Defendants' motion papers do not include affidavits or declarations from Mason, French, Soulia, Taft, Denny, or anyone else who may have had personal involvement in the use of force incident. In contrast, during his deposition, Plaintiff recalled the incident and testified Soulia "wrap[ped] his hand around [Plaintiff's] neck" and "tossed" him onto the bed. (Dkt. No. 66-4 at 63.) Plaintiff also testified Taft kicked him three times in the ribs and punched him, two or three times, in the face and neck. *Id.* at 72, 77. Plaintiff stated Denny and French repeatedly kicked the back of his head, neck, back, shoulders, and ribs. *Id.* at 74-76. Plaintiff testified that, as a result of the use of force, he "blacked out." *Id.* at 73. Plaintiff also described being handcuffed by Taft, who then proceeded to "bend" his wrists while Mason put on blue gloves and began "choking" him in an "extremely aggressive" manner. (Dkt. No. 66-4 at 79.)

Plaintiff claims that, as a result of the incident, he lost consciousness and suffered asthma attacks requiring the use of his inhaler. (Dkt. No. 66-4 at 73, 79-83.) Plaintiff concedes that he did not report injuries to the medical staff on the day of the incident, but claims he was directed

by Mason to "inform medical what I instructed you to which is that you need to  - - two puffs of your inhaler.  You're not going to mention anything else[.]" *Id*. at 95.  Plaintiff also testified that he sought medical treatment, the day after the incident, for chest pains, bruising, swelling, dizziness, and shortness of breath.  *Id.* at 39, 105-106.  Defendants do not dispute this account and failed to provide an affidavit or declaration from any individual personally involved in Plaintiff's medical treatment.

On the record before the Court, Plaintiff has identified the date and location of the alleged force, and described the alleged force.  Since Plaintiff's "allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically," summary judgment is inappropriate.  *See Wright v. Goord*, 554 F.3d 255, 269 (2d Cir. 2009).  Moreover, because the Second Circuit has "never held that a court may grant summary judgment to officers on an excessive force claim merely because the injuries were minor even where the force was unreasonable," *see Ketcham*, 992 F.3d at 150–51, I recommend Defendants' motion for summary judgment dismissing Plaintiff's excessive force and failure-to-intervene claims regarding the incident of May 27, 2017, be denied.

### C.    Claims for Compensatory Damages

Plaintiff's ability to recover damages is limited by the PLRA.  Pursuant to the PLRA, "[n]o Federal civil action may be brought by a prisoner . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e) (2006).  Prisoners who bring civil actions without a prior showing of physical injury are limited to recovering compensatory damages for actual injury, nominal damages, punitive damages, injunctive relief, and declaratory relief.  *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002).

For the reasons set forth in Part IV(B) *supra*, I recommend the Court deny Defendants' motion to dismiss Plaintiff's request for compensatory relief.

### D.      Claims Against Mason

Defendants move for summary judgment and dismissal of Plaintiff's Eighth Amendment conditions-of-confinement claims and First Amendment free exercise claims against Mason arguing that Mason was not personally involved in the decision to turn off Plaintiff's water.[7] (Dkt. No. 66-2 at 14-15.)

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977).  "Because vicarious liability is inapplicable to . . .§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.").  Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Plaintiff claims that Mason was responsible for shutting off the water in his cell on May 25, 2017.  (Dkt. No. 53 at ¶¶ 15-19.)  During his deposition, Plaintiff testified:

> A.      . . . French made - - he made a statement about the toilet being cut off when Mason was trying to flush down my [asthma pump].

---

[7]  Defendants do not offer any arguments related to the merits of the Eighth or First Amendment claims.

> And Mason got it in his hand and attempted to throw it in the toilet and flush it and then French basically let him know that, you know, the toilet's not going to flush and then Mason had like a uh-huh moment, like oh, yeah, we did do that.  That's when I first realized that it was Mason or French that did it or maybe Mason instructed French to do it because no other officer said anything about the toilet or the sink or anything like that.

(Dkt. No. 66-4 at 32-33.)

Plaintiff's account of events is uncontested.  Mason, who concedes he was the sergeant for D-Block on May 25, 2017, and May 26, 2017, did not provide an affidavit or declaration in support of the motion for summary judgment.  (Dkt. No. 76-2 at 15-16, 30, ¶ 5.)

A personal involvement inquiry on summary judgment "examines only whether there is record evidence to support a factfinder's conclusion that the individual under consideration was involved in the alleged conduct."  *Brandon v. Schroyer*, No. 9:13-CV-0939 (TJM/DEP), 2016 WL 1638242, at *14 (N.D.N.Y. Feb. 26, 2016), *adopted by* 2016 WL 1639904 (quotation omitted).  Plaintiff's deposition testimony constitutes such evidence and "[a]ny discrepancies or inconsistencies in [the] plaintiff's testimony are for a jury to assess."  *Latouche v. Tompkins*, No. 9:09-CV-308 (NAM/RFT), 2011 WL 1103045, at *5 (N.D.N.Y. Mar. 23, 2011).  "[U]nder Rule 56, defendants have failed to carry their burden of presenting affidavits or other evidence to support their claim that no material issues of fact exist as to the personal involvement" of Mason. *See Davis v. Goode*, 995 F.Supp. 82, 91 (E.D.N.Y. 1998); *see also Guarneri v. Hazzard*, No. 9:06-CV-985 (NAM/DRH), 2010 WL 1064330, at *24 (N.D.N.Y. Mar. 22, 2010 ) (denying the defendants' motion for summary judgment with regard to involvement because the defendant failed to submit an affidavit).  Accordingly, I recommend that Defendants' motion for summary judgment, on this ground, be denied.

### E.   Eighth Amendment Deliberate Medical Indifference

Plaintiff contends Nurse Bleau was deliberately indifferent to his serious medical needs by failing to provide him adequate treatment on May 26, 2017.  (Dkt. No. 53 at ¶ 95; Dkt. No. 66-4 at 107-123.)  Plaintiff also claims non-medical defendants, Mason, French, Soulia, Taft, and Denny prevented him from receiving adequate medical care.  (Dkt. No. 53 at ¶ 92.)  Defendants argue Bleau was not personally involved with Plaintiff's medical treatment.  (Dkt. No. 66-2 at 12.)  Defendants also contend they did not act with deliberate indifference.  *Id*. at 16-19.

#### 1.   Personal Involvement

In the caption of the original complaint, Plaintiff identified "John Doe Nurse working the 7-3 pm tour of duty on 5/26/17 on the 1st floor of Clinton C.F. hospital/clinic".  (Dkt. No. 1 at 1). After a review of the complaint, the Court found that Plaintiff's Eighth Amendment claims against Nurse John Doe survived review and directed Plaintiff to "take reasonable steps to ascertain the identity of the 'Doe' defendants[.]"  (Dkt. No. 9 at 32.)  In December 2019, Plaintiff filed a motion to amend with a proposed amended complaint.  (Dkt. No. 28.)  In a Decision and Order filed on January 13, 2020 (the "January Order"), the Court noted that while Plaintiff was unable to identify Nurse John Doe, he provided "more detailed allegations regarding the physical characteristics of defendant Nurse John Doe."  (Dkt. No. 34 at 5.)  After a review of the amended complaint, the Court issued a *Valentin* Order directing the Attorney General's Office to attempt to ascertain the full name of Nurse John Doe.  *Id*. at 23.

The Assistant Attorney General responded and disputed Plaintiff's claim that he was treated in the medical department on May 26, 2017.  (Dkt. No. 42.)  Nevertheless, the Attorney General identified Shawn Bleau as the male nurse working the 6:00 a.m. to 2:00 p.m. shift on

May 26, 2017.  *Id*. at 2.  Counsel advised, "there is no document that corroborates Plaintiff's

allegation that Mr. Bleau (or anyone else) saw the Plaintiff or that Mr. Bleau (or anyone else)

provided Plaintiff with medical treatment on May 26, 2017.  *Id*.  Relying upon this information,

Plaintiff amended his amended complaint and named Bleau as a defendant.  (Dkt. No. 53.)

Plaintiff testified under oath that Bleau treated him on May 26, 2017.  (Dkt. No. 66-4 at

107-123.)  Plaintiff testified he told Bleau that he sustained his injuries during a "use of force"

incident on May 25, 2017.  *Id*.  Plaintiff claims Bleau "wrote these things down" in a folder and

left the examination room.  *Id*.  Bleau returned with Mason and, according to Plaintiff, Mason

"gives me a look basically like, no, you did not just try to complain."  *Id*. at 109.  Plaintiff

testified, "[a]nd that's when I told the Nurse Bleau - - I don't - - I don't have any injuries.  I'm

okay.  I'm fine."  (Dkt. No. 66-4 at 107-123.)  Plaintiff claims Bleau destroyed "the medical

document" he created at Plaintiff's medical visit.  (Dkt. No. 53 at ¶ 62-63.)

In support of the motion, Bleau provided a declaration stating he was not personally

involved in Plaintiff's medical treatment on May 26, 2017.  (Dkt. No. 66-21 at ¶ 5.)  Bleau claims

he "had no interaction" with Plaintiff in May or June 2017.  *Id.* at ¶ 13.  Indeed, Bleau claims he

reviewed the "log book entries from May 25, 2017 through May 27, 2017" and concludes

Plaintiff was not seen at sick call on May 26, 2017.  *Id.* at ¶¶ 6-9.

As discussed *supra*, "[p]ersonal involvement is generally a question of fact and summary

judgment may be granted only where the defendant establishes that no issues of material fact

exist such that the defendant is entitled to summary judgment as a matter of law."  *Guarneri*,

2010 WL 1064330, at *23.  Simply stated, based on the present record, there exists a dispute of

material fact with respect to whether Bleau was personally involved in Plaintiff's medical treatment.

### 2.     Merits of Deliberate Medical Indifference Claims

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This standard contains objective and subjective components. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures the defendant acted with a sufficiently culpable state of mind. *Id*. at 184 (citing*, inter alia, Chance*, 143 F.3d at 702).

To satisfy the objective element, the alleged deprivation must be "sufficiently serious." *Salahuddin*, 467 F.3d at 279 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious involves two inquiries. *Id*. The first question is whether the plaintiff was deprived of adequate medical care. *Id*. Prison officials who act "reasonably" in response to the inmate's health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id*. (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Salahuddin*, 467 F.3d at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id*. (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's

condition itself is "sufficiently serious." *Id.* (citing *Smith*, 316 F.3d at 185-86).   A condition is "sufficiently serious" in objective terms if it presents "a condition of urgency, one that may produce death, degeneration, or extreme pain . . . ." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (citation omitted).   Factors that should be considered in assessing whether a medical need is sufficiently serious include: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (quoting *Chance*, 143 F.3d at 702).

"Where a plaintiff alleges that inadequate care was provided—instead of alleging a failure to provide any treatment—the inquiry focuses on 'the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract.' " *Revels v. Corr. Med. Care, Inc.*, No. 9:17-CV-0088 (MAD/TWD), 2018 WL 1578157, at *4 (N.D.N.Y. Mar. 28, 2018) (quoting *Smith*, 316 F.3d at 186); *Salahuddin*, 467 F.3d at 280 (noting that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability (citation omitted)).   It is well established that "a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Spavone v. New York State Dep't of Corr. Svcs.*, 719 F.3d 127, 123 (2d Cir. 2013).   "[P]rison officials fulfill their obligations under the Eighth Amendment when the care

provided is 'reasonable.' " *Jones v. Westchester Cty. Dep't of Corrs.*, 557 F.Supp.2d 408, 413 (S.D.N.Y. 2008) (citing *Salahuddin*, 467 F.3d at 280).

To satisfy the subjective element, the plaintiff must demonstrate that defendants had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . . the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40). Therefore, "the defendant's belief that his conduct posed no risk of serious harm 'need not be sound so long as it is sincere,' and 'even if objectively unreasonable, a defendant's mental state may be nonculpable.' " *Wright v. Genovese*, 694 F.Supp.2d 137, 154-55 (N.D.N.Y. 2010) (quoting *Salahuddin*, 467 F.3d at 281).

### a.    Defendant Bleau

Even assuming that Bleau was personally involved in Plaintiff's medical treatment. no reasonable jury could find that he deprived Plaintiff of "adequate medical care." *Salahuddin*, 467 F.3d at 276. Plaintiff testified that he saw Bleau on May 26, 2017, for complaints of shortness of breath, headaches, fatigue, numbness in his fingers, and "a knot in [his] chest." (Dkt. No. 66-4 at

106-107.)  Plaintiff claims that Bleau conducted a physical and visual examination.  *Id.* at 106-

117.  Bleau used a stethoscope to monitor Plaintiff's lungs and breathing.  *Id.* at 110-114.  Bleau

directed Plaintiff to "take deep breaths about five to six times" and discussed Plaintiff's asthma

and medication.  *Id*.  Bleau used a "thumb tack" to check for numbness in Plaintiff's fingers,

"look[ed] at his wrists," squeezed his fingers, and "checked to see if [he] had a range of motion."

(Dkt. No. 66-4 at 110-114.)  Plaintiff testified that Bleau gave him "twelve Ibuprofens" for his

"throbbing" head pain.  *Id*. at 118.  The record evidence demonstrates Plaintiff's medical

complaints were reasonably treated and monitored.

        In opposition to the motion, Plaintiff claims that Bleau failed to treat him for an asthma

attack on May 26, 2017.  (Dkt. No. 76-3 at 31.)  However, there is no evidence to support

Plaintiff's claim that he was experiencing an asthma attack when he was treated at medical on

May 26, 2017.  Indeed, during his deposition, Plaintiff testified he explained to Bleau that he was

"having shortness of breath" and his "breathing doesn't feel normal" but he did not testify he was

exhibiting any visible signs of distress, of which Bleau ignored.  (Dkt. No. 66-4 at 107.); *cf.*

*Boston v. Suffolk Cty.* 326 F.Supp.3d 1, 20 (E.D.N.Y. 2018) (finding issue of fact regarding

deliberate indifference where the plaintiff exhibited outward signs of distress).

        Accordingly, the Court finds no genuine issue of fact as to whether Plaintiff was deprived

of adequate medical care under the objective prong of the deliberate indifference analysis.

        Moreover, even assuming Plaintiff could satisfy the objective prong, the Court finds no

reasonable jury could find Bleau acted with a sufficiently culpable state of mind.  Plaintiff

testified that Bleau did not utilize "the full machine" to check his pulse or the "blood pressure

thing."  (Dkt. No. 66-4 at 115.)  During the deposition, Defendants' counsel asked "what else did

you want that the - - Defendant Bleau to do at that point?"  *Id*. at 118.  Plaintiff responded:

> A.    Well, at - - at that point was my breathing.  At least keep me
> there for at least another half an hour to see if the medication is
> actually going to work, to see if the asthma inhaler was actually
> going to work.
>
> [. . .]
>
> So I was in  - - wanted him to do more of a fuller exam and just
> not prescribe me something that is always prescribed no matter
> what you complained of.

(Dkt. No. 66-4 at 118-119.)

Disagreements over medication, diagnostics, forms of treatment, and the need for

specialists are not adequate grounds for a Section 1983 claim, since those issues implicate

medical judgment and at worst negligence constituting malpractice.  *See Sonds v. St. Barnabas

Hosp. Corr. Health Servs*., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001); *see also Washington v.

Westchester Cty. Dep't of Corr*., No. 13 Civ. 5322, 2014 WL 1778410, at *6 (S.D.N.Y. Apr. 25,

2014) ("The law is clear that the medication a doctor selects to treat the patient's conditions is a

medical judgment and does not rise to the level of deliberate indifference."); *Wright*, 694

F.Supp.2d at 160 ("Differences in opinions between a doctor and an inmate patient as to the

appropriate pain medication clearly do not support a claim that the doctor was deliberately

indifferent to the inmates' 'serious' medical needs.") (collecting cases).  Thus, the fact that

Plaintiff might have preferred an alternative treatment or believes he did not get the medical

attention he wanted does not rise to the level of a constitutional violation.  *See Dean v. Coughlin*,

804 F.2d 207, 215 (2d Cir. 1986) (holding an inmate does not have the right to treatment of his

choice); *see also Adams v. Smith*, No. 9:15-CV-913 (BKS/DJS), 2018 WL 1363495, at *4

(N.D.N.Y. Mar. 16, 2018) ("Courts have repeatedly rejected medical indifference claims based

upon a failure to provide stronger pain medication.") (collecting cases).

In light of the foregoing, the Court finds no reasonable factfinder could conclude Bleau

was deliberately indifferent to Plaintiff's serious medical needs.  Therefore, the Court

recommends granting summary judgment to Bleau.

### b.      Claims Against Non-Medical Defendants

Although medical deliberate indifference claims are most often asserted against medical

personnel, non-medical personnel may also be held liable for deliberate indifference to medical

needs where a plaintiff proves that "prison personnel intentionally delayed access to medical care

when the inmate was in extreme pain and has made his medical problem known to the attendant

prison personnel." *Hodge v. Coughlin*, No. 92 Civ. 0622, 1994 WL 519902, at *11 (S.D.N.Y.

Sept. 22, 1994) (citations and internal quotation marks omitted), *aff'd*, 52 F.3d 310 (2d Cir. 1995)

(table); *Baumann v. Walsh*, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999) *see also Estelle*, 429 U.S.

at 104-05 (noting that deliberate indifference may be manifested when prison guards

intentionally deny or delay access to medical care).  Non-medical personnel may also be found to

violate the Eighth Amendment if prison employees intentionally interfere with treatment, once

prescribed. *Miller v. Fisher*, No. 92-CV-973 (DNH), 1993 WL 438761, at *3 (N.D.N.Y. Oct. 26,

1993), *report and recommendation approved*, 1995 WL 131561 (N.D.N.Y. Mar. 23, 1995)

(citing *Estelle*, 429 U.S. at 104-105).

Here, Plaintiff claims that Taft, Soulia, Mason, French, and Denny showed deliberate

indifference to his serious medical needs because "they did nothing to provide plaintiff

31

immediate medical attention after his first asthma attack" and "failed to provide medical attention when Plaintiff was unconscious."  (Dkt. No. 76-3 at 32-33.)

During his deposition, Plaintiff was questioned about his asthma inhaler and testified that, before Defendants entered his cell, it was on top of his locker.  (Dkt. No. 66-4 at 80.)  During the commotion in his cell, the inhaler was knocked to the floor.  *Id.*  Plaintiff testified:

> A.   Mason picks it up, you know, after he lets go of his choke hold, I'm dizzy and ask for my asthma pump, he takes the pump, goes to try, and throw it down the toilet.  And he goes to press the button in and that's when I hear French and him come and see the button, you know, the toilet not working and him saying that oh yeah, I forgot we did that.
>
> Then he takes the asthma pump out at that point in time, you know, removes the canister from it - from its case.  Blows into it, puts the canister back into this case and you got to hope this works bud, then after that, you know, I'm taken out of my cell and drive to the back of the company.

(Dkt. No. 66-4 at 80-81.)

Plaintiff also testified that after the incident, Soulia, Mason, French, Taft, and Denny escorted him to the medical unit.  (Dkt. No. 66-4 at 82.)  Plaintiff claims he repeatedly asked for his asthma medication, told the officers that he was having an asthma attack, and complained that he would "eventually pass out." *Id.*  Plaintiff testified that, in response to his requests, he was verbally harassed with racial slurs. *Id*.  The asthma pump "eventually [ ] got to Soulia's hands" and Soulia gave Plaintiff a "puff of the medication." *Id*. at 83.  When Plaintiff complained that the medication was not working, Soulia "purposely sprayed that - - the asthma medication into [Plaintiff's] face."  (Dkt. No. 66-4 at 83.)  Soulia asked Plaintiff if it "burned," and "everybody was saying at one point in time, it did not burn, try it again." *Id.*

Despite Plaintiff's deposition testimony, Taft, Soulia, Mason, French, and Denny failed to submit declarations refuting or otherwise addressing Plaintiff's testimony in their summary judgment motion.  The Court finds that Plaintiff's unchallenged deposition testimony and averments in his affidavit are sufficient to raise a material issue of fact as to whether Taft, Mason, French, and Soulia interfered with Plaintiff's medically prescribed treatment "solely for the purpose of causing an inmate unnecessary pain."  *See Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) (citation omitted) (reasoning that the plaintiff may have a claim for relief, "if the nurses refused him necessary medical attention as a form of punishment for misconduct unrelated to his medical condition or treatment.").  Therefore, I recommend that the Court deny Defendants' motion for summary judgment on this ground.

## F.    First Amendment Claims Against Deyo

Defendants move for summary judgment and dismissal of the First Amendment free exercise and retaliation claims against Deyo.  (Dkt. No. 66-2 at 20-22.)   Defendants argue Plaintiff failed to establish that Deyo was personally involved in the deprivation of his First Amendment rights.  *Id*. at 12-13.  Alternatively Defendants argue Plaintiff failed to establish that Deyo's actions substantially burdened his sincerely held religious beliefs or constituted an adverse action.  *Id*. at 20-22.

### 1.    Personal Involvement

Defendants contend that summary judgment is warranted because Plaintiff, "has failed to offer any explanation as to why he was unable to identify Defendant Deyo as the individual who is alleged to have deprived him of his rights" when questioned by "a Sergeant tasked with investigating the [April 12, 2018] grievance[.]" (Dkt. No. 66-2 at 13.)

The record establishes that, in April 2018, Plaintiff filed a grievance claiming that "John Doe working on 2 company of B-Block" on April 12, 2018, at approximately 6:45 a.m., refused to allow him to attend "N.O.I. service." (Dkt. No. 66-17 at 1.)   Sergeant Bruce Shutts ("Shutts") interviewed Plaintiff in connection with the grievance.  (Dkt. No. 66-25 at ¶ 4.)  In support of the motion for summary judgment, Shutts provided a declaration and avers that Plaintiff "told him that he did not know who the officer was who refused to let him out of his cell[.]"  *Id*. at ¶ 5. Shutts also claims Plaintiff was unable to provide a physical description of the officer.  *Id*. Shutts interviewed Deyo because "he was one of the officers assigned to B-Block on the day of the alleged interaction."  *Id*. at ¶ 6.  Shutts claims Deyo denied the allegations and maintained that he did not prohibit Plaintiff from attending the religious service.  (Dkt No. 66-25 at ¶ 6.) Deyo executed a signed statement indicating, "at no time did I or any other Officer deny inmate Little his Callout or harass him in any way."  (Dkt. No. 66-12 at 7.)  The record before the Court however, does not contain an affidavit or declaration from Deyo.

Conversely, Plaintiff claims he provided a "physical description of Deyo" to Shutts during the interview and contends that Shutts "did not document this statement in any report."  (Dkt. No. 76-1 at ¶ 2(q).)  In the original complaint, Plaintiff named "John Doe C.O. working on 2 company of B-Block on April 12, 2018 during the 7-3 pm tour of duty" as a defendant.  (Dkt. No. 1 at 1).  In the motion to amend his complaint, Plaintiff identified the John Doe C.O. as J. Deyo. (Dkt. No.  28-1 at 3.)  In his deposition, Plaintiff specifically named Deyo as the officer who refused to allow him to attend a religious service on April 12, 2018.  (Dkt. No. 66-4 at 148-161.)

For the reasons set forth in Part IV(D) and (E)(1) *supra*, I recommend that Defendants' motion for summary judgment, on this ground, be denied.

34

### 2.   Free Exercise Claim

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  However, the right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere*, No. 04-CV-57 (DNH/DEP), 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) (citing *O'Lone v. Estate of Shabbaz*, 482 U.S. 348 (1987)).

To succeed on a claim under the Free Exercise Clause, the plaintiff must show at the threshold that the challenged conduct "substantially burdens his sincerely held religious beliefs." *Pugh v. Goord*, 571 F.Supp.2d 477, 497 (S.D.N.Y. 2008) (quoting *Salahuddin*, 467 F.3d at 274-75).  Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. *See Williams v. Doe*, 639 Fed. App'x at 55, 56 (2d Cir. 2016) ("We have not yet decided whether a prisoner asserting a free-exercise claim must, as a threshold requirement, show that the disputed conduct substantially burdened his sincerely held religious beliefs."); *Holland v. Goord*, 758 F. 3d 215, 220-21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendant's conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim).  In the absence of any controlling precedent to the contrary, courts in this District have continued to apply the substantial burden test. *See, e.g., Wright v. Stallone*, No. 9:17-CV-0487 (LEK/TWD), 2018 WL 671256, at *9 (N.D.N.Y. Jan. 31, 2018) (applying substantial burden test); *Berisha v. Ferrell*,

35

No. 9:13-CV-1191 (LEK/ATB), 2016 WL 1295178, at *3 (N.D.N.Y. Mar. 8, 2016) (same); *Skates v. Shusda*, 9:14-CV-1092 (TJM/DEP), 2016 WL 3882530, at *4 & n.6 (N.D.N.Y. May 31, 2016) (same).

A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature. *Ford*, 352 F.3d at 590. A prisoner's sincerely held religious belief is "substantially burdened" where "the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 476-77 (2d Cir. 1996). Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (quoting *Ford*, 352 F.3d at 595) (punctuation omitted).

In their motion, Defendants do not dispute that Plaintiff's religious beliefs are sincerely held. Rather, Defendants contend that Plaintiff's rights were not substantially burdened because the denial of a single religious service is not a constitutional violation. (Dkt. No. 66-2 at 20-21.) In his opposition, Plaintiff argues that missing the service caused Plaintiff "to commit a grave offense with respect to his faith." (Dkt. No. 76-3 at 34.)

"[P]risoners have a constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir. 1993) (citations omitted). While "there is no bright-line rule as to the frequency with which missing religious services . . . becomes a burden of constitutional significance," courts in the Second Circuit have routinely held that missing one religious prayer or service does not constitute a substantial burden necessary to sustain a First

Amendment infringement claim.  *See Walker v. Martuscello*, No. 9:18-CV-1189 (BKS/CFH),

2019 WL 7971881, at *7 (N.D.N.Y. Dec. 9, 2019) (internal quotation marks omitted), *report and*

*recommendation adopted*, 2020 WL 132313 (N.D.N.Y. Jan. 13, 2020); *see Hankins v. N.Y. State*

*Dep't of Corr. Servs*., No. 9:07-CV-0408 (FJS/GHL), 2008 WL 2019655, at *5 (N.D.N.Y. Mar.

10, 2008) ("an allegation that prison officials caused a prisoner to miss one religious service fails

to state an actionable claim under the First Amendment") (collecting cases); *Gill v. DeFrank*, No.

98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (missing one religious service did

not substantially burned inmate's free exercise rights), *aff'd* 8 Fed. App'x 35, 37 (2d Cir. 2001);

*Johnson v. Newton*, No. 02-CV-1277 (TJM/DRH), 2007 WL 778421, at *5 (N.D.N.Y. Mar. 13,

2007) ("missing one religious service does not constitute a substantial burden on an inmate's

right to the free exercise of his religion") (quotation omitted); *Cancel v. Mazzuca*, 205 F.Supp.2d

128, 142 (S.D.N.Y. 2002) (depriving an inmate of attendance at a single religious service does

not state a § 1983 claim under the First Amendment).

Here, Plaintiff has not proffered any evidence establishing that attendance at the service

"was central or important" to his faith.  *See Ford*, 352. F.3d at 594.  Plaintiff filed a grievance

related to the incident and alleged that the decision to refuse to allow him to attend the service

was discriminatory and/or retaliatory in nature.  (Dkt. No. 66-17 at 1.)  Plaintiff claimed that the

decision was made "to make grievant stop pursuing his grievance [ ] against Taft."  (Dkt. No. 66-

12 at 5.)  Notably absent from Plaintiff's grievance record is any mention of his religious beliefs

or how missing the service burdened his beliefs.

Moreover, the Court has thoroughly reviewed the deposition transcript and finds that

Plaintiff was provided with the opportunity to explain the impact or importance of the service to

his religious beliefs, and failed to do so.  Plaintiff discussed "general orders" of his faith and

claimed that he had a "post" that day that required him to "stand on the right side of the

minister[.]" (Dkt. No. 66-4 at 155-156.)  Plaintiff testified that, as a result of missing the service,

he was unable to "receive the message." (Dkt. No. 66-4 at 157-158.)  However, when asked if he

was able to speak with the minister, or anyone else, to understand what happened during the

service, Plaintiff conceded that he did not know what transpired because, "maybe he was asking

the wrong people" and "the one person" who understood had "already left the facility." *Id*. at

157-158.  The Court has searched the record and finds no evidence establishing that the

particular NOI service was central to Plaintiff's religious observance.

Upon review of the record, the Court finds Plaintiff has not established that he was

"denied the ability to attend any other services or participate in any other aspects of his religion,

or that this one incident was part of a systematic problem or policy of denying religious

services[.]" *See McLeod v. Williams*, No. 18-CV-115, 2020 WL 2512164, at *5 (S.D.N.Y. May

15, 2020) (citations omitted).  Accordingly, Plaintiff cannot make the threshold demonstration of

"substantial burden" necessary to succeed on his free exercise clause claim.  Therefore, the Court

recommends granting summary judgment to Deyo on Plaintiff's First Amendment free exercise

claim.

### 3.    Retaliation

Defendants also seek summary judgment on the grounds that Plaintiff's First Amendment

retaliation claim fails as a matter of law.  (Dkt. No. 66-2 at 21-22.)

"Courts properly approach prisoner retaliation claims 'with skepticism and particular

care,' because 'virtually any adverse action taken against a prisoner by a prison official - even

those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quotation and other citation omitted).  "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show . . . '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)).

"Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis*, 320 F.3d at 353 (internal quotation marks and citation omitted).  In making this determination, courts are to "bear in mind" that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (internal quotation marks and citations omitted).  This is an objective test, so an adverse action may be found even if the plaintiff himself was not subjectively deterred from exercising his rights. *Gill*, 389 F.3d at 381.

Defendants do not contest that Plaintiff engaged in protected conduct.  Rather, Defendants argue, without supporting caselaw or admissible evidence, that Plaintiff cannot establish the second prong of the retaliation analysis because the denial of a single religious service does not constitute an adverse action.  Defendants' proposition is not only conclusory, it is contradicted by caselaw.  Indeed, courts in this Circuit have held that "a prisoner of ordinary firmness, forced to choose between exercising the right to file a law suit or grievance, and

39

properly observing the tenants and requirements of their religion, would likely be deterred from exercising that protected right." *See Guillory v. Fischer*, No. 9:12-CV-00280 LEK, 2013 WL 1294626, at *10 (N.D.N.Y. Mar. 7, 2013) (citing *Davis*, 320 F.3d at 353), *report and recommendation adopted*, 2013 WL 1293821 (N.D.N.Y. Mar. 28, 2013); *see Martinez v. DeMarco*, No. 13-CV-1319, 2020 WL 2571978, at *6 (E.D.N.Y. May 21, 2020) (holding that the plaintiff "sufficiently alleged that corrections officers prevented him from attending religious services on April 18, 2013 in retaliation" for complaints against the officers); *see Adekoya v. Herron*, No. 6:10-CV-6646, 2013 WL 6092507, at *8 (W.D.N.Y. Nov. 19, 2013) (concluding that the plaintiff asserted viable retaliation claims based upon the defendants decision to remove the plaintiff's name from a list for attendance of religious services).

As the movants, Defendants have the burden of showing through admissible evidence that there are no material issues of fact and they are entitled to judgment as a matter of law. *See Liberty Lobby*, 477 U.S. at 251–52. Because Defendants have failed to submit evidence in support of their motion, the Court recommends that Defendants' motion for summary judgment with respect to Plaintiff's retaliation claim against Deyo be denied.

### G.    Fourteenth Amendment Equal Protection Claims

Defendants move for summary judgment and dismissal of Plaintiff's equal protection claims arguing that Plaintiff failed to proffer evidence he was treated differently than similarly situated inmates. (Dkt. No. 66-2 at 22.)

The Equal Protection Clause provides that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v.*

*Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980)).

A plaintiff asserting an equal protection claim must prove that (1) he was treated differently from similarly situated individuals; and (2) the defendants treated him differently due to his membership in a suspect class, inhibited his exercise of a fundamental right, acted out of malice, or acted irrationally and arbitrarily.  *Harlen Assocs. v. Incorp. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

Where a plaintiff asserting an equal protection cause of action alleges that he or she was treated differently from similarly situated individuals on the basis of race, proof of racially discriminatory animus or purpose is required.  *Bussey v. Phillips*, 419 F.Supp.2d 569, 581 (S.D.N.Y. 2006).  Such intent can be shown in "several ways, including by identifying a law or policy that expressly classifies persons on the basis of race, a facially neutral law or policy that has been applied in an intentionally discriminatory manner, or a facially neutral statute or policy that has an adverse effect and is motivated by discriminatory animus." *Id.*

In addition, an equal protection claim may be brought under a "class of one" theory.  In that instance, a plaintiff must allege (1) that he was intentionally treated differently from other similarly situated individuals; and (2) that the disparate treatment was either (a) "irrational and wholly arbitrary" or (b) motivated by animus.  *Assoko v. City of New York*, 539 F. Supp. 2d 728,

734–35 (S.D.N.Y. 2008).  The standard for proving a "class of one" case becomes much more stringent after a case proceeds beyond the pleading stage.  After the pleading stage, a plaintiff must show that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and [that] the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005) *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).  There must be an "extremely high" level of similarity between the plaintiff and the persons with whom he compares himself.  *Neilson*, 409 F.3d at 104.  Furthermore, class of one plaintiffs are required to prove "intentional disparate treatment, that is, [they must] demonstrate the decisionmakers were aware that there were other similarly-situated individuals who were treated differently.*"  Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 143 (2d Cir. 2010) (quoting *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir. 2001)) (internal quotes omitted).

Here, Plaintiff claims he was discriminated against on account of his race and religion, (Dkt. No. 76-3 at 34-35), but has not identified any comparator or shown an "extremely high" level of similarity between himself and any other inmate.  Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's equal protection claims.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 66) be **GRANTED in part** with respect to the following: (1) Plaintiff's Eighth Amendment deliberate

medical indifference claims against Bleau; (2) Plaintiff's First Amendment free exercise claim against Deyo; and (3) Plaintiff's equal protection claims; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment be **DENIED** in all further respects; and it is further

**ORDERED** that in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam), the Clerks Office provide Plaintiff with copies of the following unpublished decisions.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: June 16, 2021
      Syracuse, NY

Thérèse Wiley Dancks
United States Magistrate Judge