```
 1                    UNITED STATES DISTRICT COURT

 2                    NORTHERN DISTRICT OF NEW YORK

 3

 4   CHARLES LITTLE,                        )
                                           )
 5                                         )
              Plaintiff,                   ) CASE NO. 19-CV-263
 6                                         )
       vs.                                 )
 7                                         )
     TREVAR A. SOULIA, et al.,             )
 8                                         )
              Defendants.                  )
 9   _____)
```

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HON. THOMAS J. MCAVOY**
**THURSDAY, JUNE 16, 2022**
**ALBANY, NEW YORK**

**FOR THE PLAINTIFF:**
    THOMAS, DROHAN, WAXMAN, PETIGROW & MAYLE, LLP
    By:  STEVEN L. BANKS, ESQ. and CONOR C. HORAN, ESQ.
    2517 Route 52
    Hopewell Junction, New York 12533

**FOR THE DEFENDANTS:**
    NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
    By:  DAVID C. WHITE, ESQ. and RACHAEL OUIMET, ESQ.
    The Capitol
    Albany, New York 12224

*JACQUELINE STROFFOLINO, RPR*
*UNITED STATES DISTRICT COURT - NDNY*

**19-CV-263**

1                         (Open court.)

2              THE CLERK:  The date is Thursday, June 16, 2022, at

3    10:26 a.m. in the matter of Charles Little versus Trevar Soulia

4    et al., case No. 19-CV-263.  We're here for an exhaustion

5    hearing.  May we have appearances for the record, please.

6              MR. BANKS:  Steven Banks with the law firm of Thomas,

7    Drohan, Waxman, Petigrow & Mayle for the plaintiff.

8              THE COURT:  Good morning, Mr. Banks.

9              MR. BANKS:  Good morning, Your Honor.

10             MR. HORAN:  Conor Horan, same law firm.

11             THE COURT:  Good morning, Mr. Horan.

12             MS. OUIMET:  Rachael Ouimet with the New York State

13   Attorney General's Office on behalf of defendants.

14             THE COURT:  Good morning, Ms. Ouimet.

15             MR. WHITE:  David White also with the Attorney

16   General's Office on behalf of the defendants.  Good morning,

17   Judge.

18             THE COURT:  Good morning, Mr. White.

19             All right.  I guess the defendants are going to go

20   first.  Do you have a witness for us?

21             MR. BANKS:  Your Honor, before we begin, I do have an

22   application to make.  Approximately an hour ago, I spoke with

23   the plaintiff, Mr. Little.  I anticipated that he would be here

24   this morning.  I was informed by him that he would not be at the

25   hearing today.  He said that the money that he intended to use

**19-CV-263**

1   to travel to Albany from New York City for today's appearance

2   did not materialize.  He was unable to take the train.

3            He also said that he was informed very recently, and I

4   got the sense it was today or yesterday, that his child has a

5   graduation ceremony that he wishes to attend.  I understand from

6   the conversation I had that he does not have custody of his

7   child.  The child is in the custody of his mother.

8            And based on the plaintiff's inability to get to the

9   hearing today, on behalf of Mr. Little, I would ask for an

10  adjournment.

11           THE COURT:  You want to adjourn the whole proceeding?

12  I mean it sounds to me like he had a choice, limited, limited

13  because he didn't have the funds to come up here, he says, but

14  limited also because he's choosing to go to his son's graduation

15  even though he doesn't have custody of his son, which I

16  understand that perfectly, but that's his choice, isn't it?

17           MR. BANKS:  It may very well be.  Again, I don't know

18  the relationship between his child.  I don't know the importance

19  to him of his attendance at this graduation ceremony.  I do find

20  it probably a more compelling reason for an adjournment than he

21  doesn't have the funds or he thought he would have the funds,

22  but they didn't materialize, as a legitimate reason to adjourn

23  the hearing, particularly given the significance and importance

24  of his testimony.  He does -- we do have some documents.  We do

25  have one nonparty witness, but certainly his efforts to exhaust

**19-CV-263**

1     his grievance is at issue here, and he is obviously the best

2     witness to that.

3            THE COURT:  But he's choosing not to come.  Nobody is

4     putting a gun to his head and said you can't come.  He's giving

5     us reasons why he believes he can't come.  That doesn't bode too

6     well for him in my mind.

7            Let's hear from the defendants.

8            MR. WHITE:  Judge, I have a similar state of mind as

9     Your Honor just mentioned.  We would oppose any such adjournment

10     for a number of reasons, the first one being the burden to the

11     witnesses that we have called down.  There are three witnesses

12     we expect to call today that traveled from Clinton Correctional

13     Facility, which is, as you know, hours away.  They took time out

14     of their day away from their families.  To ask them to simply do

15     that again at a later date because Mr. Little for whatever

16     reason did not show up is not something quite frankly that I

17     want to do.

18            It would be my proposal that we move forward with all

19     of the witnesses today, and that's how I would like to proceed.

20            THE COURT:  Well, maybe we could sort of have a hybrid

21     and listen to the defense witnesses and then adjourn an

22     appearance for the plaintiff.  Hopefully, he can find somehow to

23     get up here at a different date.  We could take his testimony

24     separately, and I can decide from all the testimony I hear which

25     way the case should go, which I'm willing to do.  I don't think

**19-CV-263**

1    defense wants to do that.

2           I'd like to give the plaintiff a chance.  It just

3    bothers me that he's making a decision based upon his

4    circumstances and he's saying to the Court, you know, I'll do

5    what the hell I do, but I can't do it because I don't want to.

6    I'd be willing to go that far.

7           What about it, Mr. Banks?

8           MR. BANKS:  I think that is a reasonable decision, and

9    I would support that proposal to take Mr. Little's testimony at

10   a later date, the plaintiff's case at a later date, and give him

11   at least one more opportunity to get to the courthouse to be

12   heard.

13          THE COURT:  Doesn't seem to me -- I've read all this

14   stuff.  Doesn't seem to me that there's anything defense is

15   going to say that the plaintiff is going to be able to twist his

16   testimony around to counter that.  I mean it's already

17   completely opposed.

18          Plaintiff says that he drafted these documents, that

19   he gave them to the CO Stewart, and that they were supposed to

20   go from CO Stewart to the lady that was receiving them.  She

21   said she never got them.  So you got a real factual issue.  How

22   did that play out?  Did he give the papers to Stewart, or didn't

23   he, and what did Stewart do if he got them?  All that stuff is

24   stuff I have to know to see which way to go.

25          What's the defense say about all that?

**19-CV-263**

1          MR. WHITE:  Judge, in the interest of finding a middle

2    ground, we would be amenable to what Your Honor just proposed.

3    Obviously our preference would be that this is kind of the last

4    chance for the plaintiff today, but I would indicate that if we

5    do adjourn this solely for the testimony of the plaintiff, that

6    there be some kind of direction that if he fails to attend that

7    hearing, that's it.

8          THE COURT:  I would certainly want to issue that

9    direction.  So that's how we're going to do.  We're going to

10   give him the time.  But tell him, Mr. Banks, if he chooses not

11   to come for whatever reason, he's done.  I'm going to decide

12   against him.

13         MR. BANKS:  I will convey that to him I think very

14   forcefully.  I appreciate it.

15         THE COURT:  I'm not blaming you.  You've got a client

16   to do the best you can to represent him.  If he acts

17   inappropriately, that's not on your head.  I understand that.

18         On the other hand, I understand what the defense is

19   saying.  You just can't hand everything to the plaintiff and

20   expect them to fall over and play dead, which I don't expect.

21   So let's do it that way.

22         So we're going to have witnesses from the defense?

23         MR. WHITE:  Yes, Your Honor.

24         THE COURT:  All right.  We'll start with that.

25         MR. WHITE:  Okay.  The defense would like to call CO

**Stewart - Direct**

1    James Stewart, Judge.

2              THE CLERK:  Mr. Stewart, come right up this way.

3    Please raise your right hand.  Please state your name for the

4    record.

5              THE WITNESS:  James Stewart.

6              THE CLERK:  Please spell your name for the record.

7              THE WITNESS:  J-a-m-e-s S-t-e-w-a-r-t.

8                          **JAMES STEWART,**

9      having been first duly sworn as a witness, was examined and

10                        testified as follows.

11             THE CLERK:  Thank you.  You can just take a seat right

12   up in the witness stand.  Just adjust the microphone, and please

13   speak clearly into it.

14             THE COURT:  Whenever you're ready to proceed, we can

15   go ahead if you wish.

16             MR. WHITE:  Thank you, Your Honor.

17   **DIRECT EXAMINATION BY MR. WHITE:**

18   Q    Good morning, Officer Stewart.  First of all, I appreciate

19   your time today.

20        Can you just give your name for the record, please?

21   A    James Stewart.

22   Q    And what is your current occupation, sir?

23   A    Correction officer.

24   Q    And how long have you been a correction officer?

25   A    Approximately eight years.

**Stewart - Direct**

1   Q    Where do you currently work?

2   A    I currently work in the special housing unit.

3   Q    What facility?

4   A    Clinton Correctional Facility.

5   Q    Were you working at Clinton Correctional Facility in 2017?

6   A    Yes.

7   Q    Can you please explain your job duties as a correction

8   officer at Clinton Correctional Facility?

9   A    In charge of the safety and security.

10  Q    And are you ever responsible for collecting incarcerated

11  individuals' mail in your role as a correction officer at

12  Clinton Correctional Facility?

13  A    I've never had one of the jobs where it required you to

14  collect the mail.

15  Q    Was that true in May of 2017, sir?

16  A    Yes.

17  Q    And are you aware of who was responsible for collecting the

18  mail during that time?

19  A    Depends on the location.

20  Q    So is it fair to say that it would be a large number of

21  people that may be involved in the collection of incarcerated

22  individuals' mail?

23  A    Yes.

24  Q    Would it change from day to day?

25  A    Yes, every day.

**Stewart - Direct**

1  Q    Now, do you personally go through an individual's mail when

2  or after it is picked up from their cell?

3  A    No.

4  Q    Have you ever done that?

5  A    No.

6  Q    Do you recall interacting with the plaintiff in this case,

7  Mr. Charles Little?

8  A    I don't recall.

9  Q    Have you ever had any issues to your knowledge with

10 Mr. Little?

11 A    Not that I recall.

12 Q    Are you aware of Mr. Little having any issues or problems

13 with you, Officer?

14 A    No.

15 Q    Are you aware of any staff having issues with Mr. Little?

16 A    No.

17 Q    Now, did you ever become aware of staff or DOCCS personnel

18 destroying or disposing of an incarcerated individual's

19 grievance at any time since you've worked at Clinton

20 Correctional?

21 A    No.

22 Q    Did you ever become aware specifically of staff or DOCCS

23 personnel destroying or disposing of Mr. Little's grievances

24 while he was incarcerated at Clinton Correctional?

25 A    No.

**Stewart - Direct**

1    Q    Have you ever become aware of any staff going through

2    Mr. Little's mail from May of 2017 through July of 2017 at

3    Clinton Correctional?

4    A    No.

5    Q    Now, in this case, as you're aware at this point,

6    Mr. Little alleges that on May 29 of 2017, he was told by you

7    that individuals in keep-lock could submit any mail or

8    grievances to the first officer, who would collect it.  Did you

9    ever say that, Officer?

10          MR. BANKS:  Your Honor, that's a statement I don't

11    believe that is in evidence, and if it is in evidence, I think

12    counsel should direct us to the exhibit that contains that

13    statement.

14          THE COURT:  Well, he's not asking him to verify the

15    truth of the statement.  He's asking him:  Was there such a

16    statement made?  I think he can tell us if he remembers that.

17    A    No, I don't recall.

18    Q    Now, is it your understanding that that is how the

19    collection system works at Clinton Correctional as far as the

20    first officer collecting the mail?

21    A    No.  First officer would not collect the mail.

22    Q    What is your understanding of how the mail is collected?

23    A    Would depend on the location where the inmate was housed.

24    Q    I'll represent to you that Mr. Little during this time

25    period was housed in D-block.  Are you familiar with how the

**Stewart - Direct**

1   mail was collected in D-block?

2   A    Yes.

3   Q    Can you just briefly explain that to the Court, please?

4   A    A company officer would collect it or the incarcerated

5   individual could give it to one of the porters there in the

6   block to bring it up front to put it in the lockbox.

7   Q    Now, Mr. Little further claims that he submitted a

8   grievance to you for filing, that you subsequently disposed of

9   that grievance so that it would not be filed.  Did you do that,

10  Officer?

11  A    Absolutely not.

12  Q    Are you aware of anybody doing that?

13  A    No.

14  Q    Now, additionally, Mr. Little, the plaintiff here, claims

15  that during a discussion with Sergeant Holland, he was told that

16  you disposed of plaintiff's May 29, 2017, grievance.  Did you

17  ever advise Sergeant Holland that you disposed of the

18  plaintiff's grievance?

19           MR. BANKS:  Objection.  Leading.

20           THE COURT:  I'll overrule.

21  Q    You can answer.

22  A    No.

23  Q    Did you ever tell anyone that you disposed of plaintiff's

24  May 29, 2017, grievance?

25  A    No.

**Stewart - Direct**

1   Q    Now, if it ever came to your attention that a DOCCS

2   employee had purposefully destroyed or disposed of an

3   incarcerated individual's grievance or mail, is that something

4   that you would be required to report?

5            MR. BANKS:  Objection, Your Honor.  Leading and

6   argumentative.

7            THE COURT:  I don't know leading.  I think it's

8   calling for information that this individual may not have or be

9   able to have as to what other people did with grievances that

10  were presented to them.  I'll sustain the objection.

11  Q    The question, if you became aware that any other DOCCS

12  employee had disposed of or otherwise tampered with a grievance,

13  are you required to report that as a correction officer?

14  A    Yes.

15          MR. WHITE:  That's all the questions I had for you,

16  Officer.  Thank you very much for your time.

17          THE WITNESS:  Thank you.

18          THE COURT:  All right.  You may cross-examine,

19  Mr. Banks.

20          MR. BANKS:  Your Honor, I do know each party has a set

21  of exhibits that they prepared for this matter, and there are

22  exhibit binders.  I think it might be -- I didn't know if

23  defendants wanted to give the witness their -- leave a set of

24  exhibits on the witness stand that we can refer to, or I can

25  certainly give the witness ours.

**Stewart - Cross**

1              THE COURT:  You can give him what you like.  The

2     defendants can do what the hell they want to do.

3              MR. BANKS:  Your Honor, may I approach the witness?

4              THE COURT:  Sure.

5     **CROSS-EXAMINATION BY MR. BANKS:**

6     Q    Officer, I'm handing you a binder with the Plaintiff's

7     Exhibits.

8              THE COURT:  So that's a binder, is it, with a number

9     of exhibits in it, Mr. Banks?

10             MR. BANKS:  Yes.  It is a binder with the Plaintiff's

11    Exhibits, which are numbered 1 through 18.  The exhibit that I

12    want to ask Officer Stewart about has been stipulated by both

13    sides.  And so at that time, I will ask that the exhibit be

14    moved into evidence.

15             THE COURT:  Okay.  So you want the whole binder

16    admitted?

17             MR. BANKS:  No, no.  I'm going to ask Officer Stewart

18    about one specific exhibit.

19             THE COURT:  When you do that, you can ask me to admit

20    it, and I will or I won't.

21             MR. BANKS:  Exactly.  Thank you.

22    Q    Officer Stewart, good morning.  My name is Steven Banks.

23    I'm an attorney representing the plaintiff in this matter,

24    Charles Little.  He also goes by the name Clifton Little.

25         I want to make clear.  You worked in D-block at Clinton

*JACQUELINE STROFFOLINO, RPR*
*UNITED STATES DISTRICT COURT - NDNY*

**Stewart - Cross**

1    Correctional Facility on May 29, 2017?

2    A    I don't recall.

3    Q    I would like to direct your attention to Exhibit 17 in the

4    binder with exhibits before you.

5         MR. BANKS:  And Your Honor, I do have another binder

6    that I can present to Your Honor so that you can see that as

7    well.

8         THE COURT:  Okay.  Thank you.

9    Q    Officer Stewart, Exhibit 17, do you have that before you?

10   A    Yes.

11   Q    Does that appear to be a copy of a page from a logbook at

12   Clinton Correctional Facility?

13   A    Yes, it does.

14   Q    Does it refer to the D-block location?

15   A    Yes.

16   Q    Is the date May 29, 2017?

17   A    That's correct.

18   Q    And does your name appear on that page?

19   A    Yes, it does.

20        MR. BANKS:  Your Honor, at this time, I would ask to

21   introduce Plaintiff's Exhibit 17 into evidence.

22        MR. WHITE:  No objection, Judge.

23        THE COURT:  Receive Exhibit No. 17 as part of a binder

24   presented to the witness by plaintiff's counsel.  That's

25   received in evidence.

**Stewart - Cross**

1   Q    So Officer Stewart, does Exhibit 17, that first page, does

2   it show that you were assigned to D-block on May 29, 2017?

3   A    That is correct.

4   Q    You were the first officer on duty that day, correct?

5   A    That afternoon.

6   Q    What were the hours of your shift on that day?

7   A    It appears to be 3-to-11 shift.

8   Q    Meaning 3 in the afternoon to 11 at night, correct?

9   A    Correct.

10  Q    And was that the block in which the plaintiff Charles

11  Stewart was housed on that date?

12  A    Who?

13  Q    The plaintiff in this case, was he housed in D-block on

14  May 29, 2017?

15  A    I don't recall that.

16  Q    Now, does D-block at Clinton Correctional Facility in May

17  of 2017, did it house keep-lock inmates?

18  A    Yes.

19  Q    Keep-lock inmates are confined to the cells; is that

20  correct?

21  A    That's correct.

22  Q    They can only leave their cells under certain limited

23  circumstances; is that correct?

24  A    That's correct.

25  Q    One example would be if there's a medical call-out; is that

**Stewart - Cross**

1    correct?

2    A    Yes.

3    Q    So the keep-lock inmate in D-block in May of 2017 would not

4    be able to leave his cell and put mail into the mailbox; is that

5    right?

6    A    That's correct.

7    Q    I just want to be clear.  The defendants in this case,

8    Officer Soulia, Officer French, Officer Mason -- I think Mason

9    is a sergeant -- Officer Taft, and Officer Denny, they worked in

10   D-block in May of 2017 as well?

11   A    Not that I recall.

12   Q    Are these officers you've worked with at Clinton

13   Correctional?

14   A    I recognize some of the names.

15   Q    In your direct testimony, you said that inmates in D-block,

16   if they were unable to get to the mailbox, could give their mail

17   to a company officer; is that correct?

18   A    That's correct.

19   Q    Is that a correction officer?

20   A    Yes.

21   Q    And at that time, you were a correction officer assigned to

22   D-block, correct?

23   A    At that time, I was the first man according to the logbook.

24   Q    And is there a procedure when an officer receives mail from

25   an inmate that the officer needs to follow?

**Stewart - Cross**

1    A    Not really.

2    Q    Does the officer check the inmate's ID card against the

3    address, you know, the address, the return address that appears

4    on the envelope of the mail?

5    A    I would assume so.

6    Q    Is that a procedure you've ever followed?

7    A    I've never had to collect the mail.

8    Q    So I just want to be clear.  So you've been eight years as

9    a correction officer, and you've never received any mail from

10   any inmate to mail on the inmate's behalf?

11   A    Correct.

12   Q    Just finally, an inmate going out, outgoing mail that is

13   sent by an inmate, is there such a thing as legal mail?

14   A    Legal mail?  Yes.

15   Q    Does that contain particular notations on the front of the

16   mail?

17   A    Usually they write legal mail on it, I would assume.

18   Q    To give clear indication that the envelope contains legal

19   mail?

20   A    Correct.

21        MR. BANKS:  I have nothing further, Your Honor.  Thank you.

22            THE COURT:  Redirect?

23            MR. WHITE:  Nothing from the defense, Judge.  Thank

24   you.

25            THE COURT:  Okay.  Thank you, Officer.  You may step

**Holland - Direct**

1    down, sir.

2              MS. OUIMET:  The defense calls Sergeant Jason Holland.

3              THE COURT:  Okay.

4              THE CLERK:  Please state your name for the record.

5              THE WITNESS:  Jason Holland.

6              THE CLERK:  And please spell your name for the record.

7              THE WITNESS:  J-a-s-o-n H-o-l-l-a-n-d.

8                            **JASON HOLLAND,**

9      having been first duly sworn as a witness, was examined and

10                          testified as follows.

11             THE CLERK:  Thank you.  You can take a seat right up

12   here in the witness stand.  Just adjust the microphone, and

13   please speak clearly into it.

14             THE COURT:  Good morning.

15             When you're ready.

16   **DIRECT EXAMINATION BY MS. OUIMET:**

17   Q    Can you please state your name again for the record?

18   A    Jason Holland.

19   Q    Who are you employed by?

20   A    New York State Department of Corrections.

21   Q    Is that DOCCS for short?

22   A    Yes.

23   Q    How long have you worked for DOCCS?

24   A    Almost 18 years.

25   Q    What facility do you work at?

**Holland - Direct**

1  A     Clinton Correctional.

2  Q     How long have you worked at Clinton?

3  A     16 years.

4  Q     Prior to Clinton, where did you work?

5  A     Shawangunk Correctional Facility and Mid-Orange

6  Correctional Facility.

7  Q     What's your current title at Clinton?

8  A     I'm a sergeant.

9  Q     What was your title in 2017?

10  A     Sergeant.

11  Q     What are some of your duties as a sergeant?

12  A     Supervising my officers and make sure my areas are running

13  as they're supposed to be, as well as any sort of issues that

14  come up with inmate complaints, stuff like that.  Just general

15  operation of housing units.

16  Q     Do you play any role in the grievance process?

17  A     I do.

18  Q     What do you do with respect to the grievance process?

19  A     When they're assigned to me through the security office,

20  which is our captains and our dep of security, I investigate the

21  complaint that's assigned to me, and I submit my investigation

22  results.

23  Q     Are you familiar with the grievance process at Clinton

24  Correctional Facility as it was in 2017?

25  A     Yes, ma'am.

**Holland - Direct**

1    Q    Is the grievance process at Clinton Correctional Facility

2    similar today as it was in 2017?

3    A    Yes, it is.

4    Q    Can you tell me a little bit about that process?

5    A    Well, when a complaint is filed by an incarcerated

6    individual, it is filtered through to the correspondence room

7    where it's determined where in the facility it's supposed to go,

8    which area supervisor.  If say an area supervisor is involved,

9    then it goes higher, and it's investigated by a lieutenant.  The

10   grievance goes from the incarcerated individual through the mail

11   to the correspondence, and then it filters through to me if it's

12   in my area, if that makes sense.  I'm sorry.

13   Q    Yes.  Are you familiar with D-block at Clinton

14   Correctional?

15   A    I am.

16   Q    How are incarcerated individuals housed in D-block?

17   A    At the time in 2017?

18   Q    Yes.

19   A    It was a long-term keep-lock, SHU overflow unit.

20   Q    What does SHU mean?

21   A    Special housing.

22   Q    So in 2017, D-block was just for long-term keep-lock and

23   SHU?

24   A    All but one company.  It was assigned to ICP, which is

25   basically a special needs unit.  So five out of the six

**Holland - Direct**

1    companies in delta-block was special housing overflow or

2    long-term keep-lock, yes, ma'am.

3    Q     Is there a procedure in place at Clinton for incarcerated

4    individuals to file a grievance complaint while housed at

5    D-block?

6    A     Yes, ma'am, there is.

7    Q     What's that procedure?

8    A     It's the same as any other block actually.  Anything from a

9    blank sheet of paper to an actual grievance form that we have

10   printed in our print shop.  You write down your personal

11   information, your name, your DIN number, your housing location,

12   your complaint, and it gets filed through the mail.

13   Q     And was that the same procedure, grievance procedure in May

14   of 2017?

15   A     Yes.

16   Q     Where does the incarcerated individual place the grievance

17   complaint once it's ready to go out?

18   A     If you were a long-term keep-lock, or when there was

19   long-term keep-lock or SHU overflow, you would put it on your

20   bars to be collected by an officer.  Any general population

21   inmate though that comes out of their cell has the opportunity

22   to put it in the mailbox themselves.

23   Q     So if the person was in keep-lock or the incarcerated

24   individual was in keep-lock, they would have to put the envelope

25   or the grievance on their gate?

Holland - Direct

1   A    Correct.  They do not come out, regularly speaking.  If

2   they do, they're mechanically restrained.  So it has to be

3   collected by a staff member.

4   Q    Who picks up the grievance or just the mail in general off

5   of the gate?

6   A    It would be the company officer assigned to that company in

7   the block.

8   Q    Is the company officer the same officer every day?

9   A    No.

10  Q    So is it fair to say that there could have been many

11  possibilities of whom would have picked up mail on a particular

12  day in D-block?

13  A    Correct.

14           MR. BANKS:  Objection to form.  Objection as to form.

15           THE COURT:  What's wrong with the form?

16           MR. BANKS:  It's pretty vague.  There's multiple

17  possibilities, whom will pick up.  I just think that's ambiguous

18  and poorly worded.

19           THE COURT:  I understood the question to be to the

20  witness to his knowledge, is it possible that different people

21  would pick up the mail or the documents from D-block when it was

22  put on the bars.  Is that basically what you understood the

23  question to be?

24           THE WITNESS:  Yes, sir.

25           THE COURT:  What's the answer?

**Holland - Direct**

1            THE WITNESS:  In short, there are bid officers in each

2    block.  Those officers also have days off, and there's relief

3    officers, and some posts that are within a block are filled

4    daily.  So there are opportunities each day for multiple

5    officers to work in each block that aren't the same as the day

6    before.

7            THE COURT:  Okay.  Well, that makes sense.

8    **BY MS. OUIMET:**

9    Q    Thank you.  Is there a specific time that mail is picked

10   up?

11   A    It's in the afternoon shift.  There's two counts that used

12   to be taken, used to take place, one at 2:00 or one at 5:00 and

13   one at 9:00.  Generally if things go the way they're supposed

14   to, it's at the 5:00 count where mail is distributed, new mail

15   is distributed, and mail going out is picked up at that point.

16   Q    Once the company officer picks up the mail from the gate,

17   where does he go with the mail?

18   A    In each block, there is a secure mailbox that's always red,

19   white, and blue in every block and has a padlock on it, marked

20   US mail.  All outgoing mail from each inmate goes inside that

21   box once collected.

22   Q    You mentioned that there's a padlock on the mailbox?

23   A    Yes, ma'am.

24   Q    Who has the key to that padlock?

25   A    Each morning, part of the visit room officer's job is to

**Holland - Direct**

1    grab a rather large mailbag.   Looks like Santa Claus's sack.   He

2    goes around to each and every block.   He unlocks the mailbox,

3    collects each piece of mail that's in there, puts it in the bag,

4    relocks the box, and continues that process until he's done the

5    whole facility.

6    Q     Would the assigned first officer to D-block ever pick up

7    the mail?

8    A     No, ma'am.

9    Q     Would the assigned first officer be able to go through the

10   mail once it's placed in the mailbox?

11   A     No, ma'am.

12   Q     Who picked up the mail from the mailbox in D-block?

13   A     It would be the visit room officer.

14   Q     Is this done every day?

15   A     Every day.

16   Q     Are you ever aware of staff destroying an incarcerated

17   individual's grievance complaint?

18   A     Not to my knowledge, ma'am, no.

19   Q     Ever aware of staff disclosing of an incarcerated

20   individual's grievance -- disposing of a grievance complaint?

21   A     No.

22   Q     Ever aware of any staff going through plaintiff Little's

23   mail from May of 2017 through July of 2017?

24   A     No.

25   Q     Are you familiar with the plaintiff, Charles Little?

**Holland - Direct**

1   A    I have documented interaction with incarcerated individual

2   Little, but I don't recall, being such a long time ago, that

3   interaction.  I'm familiar with it based on my writing, but I

4   don't recall the actual events.

5   Q    During that conversation -- well, what were the

6   circumstances surrounding your interactions, if you remember?

7   A    I was assigned a grievance complaint about keep-lock

8   recreation, I believe, if I read my report correctly, and he

9   was -- his complaint was that he was not being able to go to

10  keep-lock recreation.

11  Q    During your discussion with Mr. Little about the keep-lock

12  grievance, did you ever talk to him about another alleged

13  grievance?

14  A    No.

15  Q    During that conversation, did you ever discourage plaintiff

16  Little from filing a grievance?

17  A    No, ma'am.

18  Q    Did you ever tell anyone, any staff member at Clinton

19  Correctional Facility to dispose of Mr. Little's grievance?

20  A    No.  That's something I would never say.

21  Q    Did anyone ever tell you that they disposed of plaintiff

22  Little's grievance complaint?

23  A    No.

24  Q    If it ever came to your attention that a DOCCS employee had

25  purposefully destroyed or disposed of a grievance complaint,

**Holland - Cross**

1  would you have to report that?

2  A     Yes, I would.

3  Q     You would be required to do so?

4  A     Yes.  That's employee misconduct.

5  Q     If you failed to report and the administration later found

6  out that you had failed to report, would you have been subject

7  to discipline?

8  A     Absolutely.  That's failure to supervise on my part.

9            MS. OUIMET:  I have no other questions.

10           THE COURT:  You may cross-examine, Mr. Banks.

11           MR. BANKS:  My colleague will do the

12  cross-examination.

13           THE COURT:  Sure.

14  **CROSS-EXAMINATION BY MR. HORAN:**

15  Q     Good morning.

16  A     Good morning.

17  Q     In direct, you testified that you met with Mr. Little.  I

18  believe the date was July 27, 2017?

19  A     Correct.  That's what the report says.

20  Q     From the report?

21  A     Yes.

22  Q     Now, you were meeting with Mr. Little to discuss a

23  separate -- I'm sorry, a separate grievance complaint, correct?

24  A     His issue with keep-lock recreation was the issue, yes.

25  Q     So that was the purpose of that meeting?

**Holland - Cross**

1   A    Yes.

2   Q    Now, in that report that you made, I believe it was dated

3   the next day, July 28, you stated that Mr. Little stated that he

4   was satisfied and the matter was resolved?

5   A    Right.

6   Q    Are you aware that Mr. Little then appealed the decision of

7   that grievance complaint?

8   A    No.  Sometimes --

9        MS. OUIMET:  Objection, Your Honor.  This is beyond

10  the scope of this, of what this hearing is for.

11       THE COURT:  Whether or not it was appealed?

12       MS. OUIMET:  We're talking about a completely separate

13  grievance than the alleged --

14       THE COURT:  I thought, first of all, you asked him

15  about another grievance, and that's what he talked to Mr. Little

16  about, not the grievance we're dealing with here today.

17       MS. OUIMET:  Right.

18       THE COURT:  Court understands that.  I thought he was

19  asking him, does he understand anything about the appeal process

20  when a grievance is filed.  That would include both the one

21  we're talking about or the ones and the one he spoke with him

22  about on the 27th.  So if the question covers both, in other

23  words, what happens to a document when it's received?  Is there

24  an appeal process?  If the witness knows, okay.  If he doesn't,

25  okay.

**Holland - Cross**

```
 1              MS. OUIMET:  Your Honor, I'm not sure.  With respect,
 2   I wasn't sure that that was his question.  I thought he was
 3   talking about -- he asked whether or not Mr. Little had said he
 4   was satisfied with the grievance.
 5              THE COURT:  Satisfied?  Is that what you said?
 6              MR. HORAN:  Yes.
 7              THE COURT:  Ask it again.  Let me understand it.
 8              MR. HORAN:  So the previous question was whether in
 9   his report that sergeant filed regarding this meeting,
10   Mr. Little stated he was satisfied with that specific grievance,
11   and then sergeant testified that is correct.
12              THE COURT:  I don't know that the witness has
13   testified he talked to the plaintiff about this particular
14   grievance.
15              MR. HORAN:  I'm sorry.  This is about the keep-lock
16   recreation grievance, the separate one.
17              THE COURT:  Okay.
18   BY MR. HORAN:
19   Q    And when you spoke to Mr. Little, at least in your report,
20   you stated Mr. Little said he was satisfied with how that
21   grievance was resolved?
22   A    Right.  He was satisfied with how his situation was at the
23   time that I talked to him.  The issue was in the past.  He was
24   in a different block, to my understanding reading my report, and
25   he was receiving his keep-lock rec.  And there is also an
```

**Holland - Cross**

1    explanation for that as well, the process of being keep-locked

2    and keep-lock pending.  There's different -- there's different

3    privileges you are allowed to have under each assignment.

4    Q    So then the follow-up question to that was:  Were you aware

5    that Mr. Little then appealed that grievance complaint?

6    A    No.

7              MS. OUIMET:  Objection.  We think that that's beyond

8    the scope of what we're doing here.

9              THE COURT:  I'm going to let him answer if he knows

10   there was an appeal.

11             THE WITNESS:  A lot of the time, the investigating

12   officer doesn't receive notice that there's an appeal.  It goes

13   either before the superintendent or the IGRC committee.

14   Q    Okay.  Thank you.

15        Now, at this interview, the July 27, you and Mr. Little

16   discussed the May 29 grievance, the grievance that we're here

17   for today?

18   A    No.

19   Q    You did not?

20   A    No.

21   Q    So is it true that you informed Mr. Little that you did not

22   tolerate these types of grievances?

23   A    No.  I encourage inmates to file grievances.  It alleviates

24   a lot of problems within the facility because it's not only me

25   that's made aware.  It's the security office and the

**Holland - Cross**

1   superintendent's office as well.  If an inmate or an officer

2   that is under my supervision has an issue, I encourage them to

3   file paperwork.

4   Q    So did you ever say to Mr. Little, we are family here and

5   we don't like that type of grievance?

6   A    No.

7   Q    Did you ever tell Mr. Little that he should not try to file

8   a grievance, another grievance like the May 29 grievance?

9   A    No.

10  Q    Is it true that you informed Mr. Little that his May 29

11  grievance will never be filed?

12  A    No.

13  Q    Is it true that you told Mr. Little that his grievance was

14  thrown out?

15  A    No.

16  Q    Now, thank you.  Do you know what happened to Mr. Little's

17  May 29 grievance complaint?

18  A    I have no idea.

19  Q    So if you can recall back to that time period, do you

20  know -- I know in direct you talked about the visit room officer

21  who would come and pick up the mail.  Do you know who that would

22  have been?

23  A    I have no idea.  This is such a long time ago.

24         MR. HORAN:  Fair enough.  Thank you very much.

25         THE WITNESS:  Thank you.

**Seguin - Direct**

1          THE COURT:  Redirect?

2          MS. OUIMET:  No, Your Honor.

3          THE COURT:  Okay.  Thank you, sir.  You may step down.

4          THE WITNESS:  Thank you, Judge.

5          MR. WHITE:  Judge, at this time, the defense would

6   like to call Rachael Seguin.  Judge, I am going to follow the

7   model of plaintiff's counsel and provide the Court with the

8   original exhibit binder and put a copy of the exhibit binder on

9   the witness stand, if that's all right.

10          THE COURT:  Sure.  That's okay.

11          MR. WHITE:  Great.

12          THE CLERK:  You can come right up.  Please state your

13  name for the record.

14          THE WITNESS:  Rachael Seguin.

15          THE CLERK:  Please spell your name for the record.

16          THE WITNESS:  R-a-c-h-a-e-l S-e-g-u-i-n.

17                          **RACHAEL SEGUIN,**

18    having been first duly sworn as a witness, was examined and

19                       testified as follows.

20          THE CLERK:  Please take a seat right up here in the

21  witness stand.  Just adjust the microphone, and please speak

22  clearly into it.

23  **DIRECT EXAMINATION BY MR. WHITE:**

24  Q    Ms. Seguin, good morning.  First of all, thank you for your

25  time.

Seguin - Direct

1      Could you please again just state your name for the record?

2    A    Rachael Seguin.

3    Q    Who is your employer currently?

4    A    I work for the New York Department of Corrections and

5    Community Supervision.

6    Q    How long have you been working there?

7    A    Since 2012.

8    Q    What is your current job?

9    A    I am the director of the Incarcerated Grievance Program.

10   Q    How long have you held that role?

11   A    Since March of this year.

12   Q    What was your role prior to that?

13   A    I was the assistant director of the Incarcerated Grievance

14   Program.

15   Q    And was that your role in 2017?

16   A    Yes.

17   Q    Can you describe your job responsibilities in that role?

18   A    My responsibilities as the assistant director included

19   overseeing the grievance operations statewide, also being the

20   liaison for the AG's office, monitoring trends in correctional

21   facilities with respect to the grievance program, developing

22   reports, also reviewing grievance appeals that are submitted to

23   central office, and directly supervising the professional and

24   support staff that worked in central office grievance.

25   Q    Now, you keep mentioning the Incarcerated Grievance

**Seguin - Direct**

1  Program.  What is that?

2  A    The Incarcerated Grievance Program is a program for

3  incarcerated individuals housed in DOCCS correctional

4  facilities.  It allows them to submit a grievance complaint

5  regarding any aspect of their incarceration or confinement in a

6  facility.

7  Q    How long has that program been in place?

8  A    I believe it started in the 1970s.

9  Q    Is there such a program at every DOCCS facility in New York

10  State?

11  A    Yes.

12  Q    Was this true in 2017?

13  A    Yes.

14  Q    Are there written policies or directives in place that set

15  forth the policies and procedures of the Incarcerated Grievance

16  Program?

17  A    Yes.  The Incarcerated Grievance Program is outlined in

18  DOCCS Directive 4040.

19        MR. WHITE:  Judge, at this time, I'd like to submit to

20  the Court Defendant's Exhibit 1, which has been stipulated to by

21  the parties.  It is Directive 4040.

22        THE COURT:  That's part of the black binder you gave

23  me?

24        MR. WHITE:  Yes, it is.  It's the first exhibit,

25  Judge.

**Seguin - Direct**

 1              THE COURT:  Any objection to that?

 2              MR. BANKS:  No objection, Your Honor.

 3              THE COURT:  Receive exhibit --

 4              MR. WHITE:  Defendant's Exhibit 1.

 5              THE COURT:  Defendant's Exhibit 1 is received in

 6     evidence.

 7              MR. WHITE:  Thank you very much, Your Honor.

 8     **BY MR. WHITE:**

 9     Q    Now, Ms. Seguin, I ask that you open that binder in front

10     of you and take a look at Exhibit 1 briefly and let me know when

11     you've had the chance to do that.

12     A    Yes.

13     Q    And are you familiar with this document?

14     A    I am, yes.

15     Q    And based upon your review of Defendant's Exhibit 1, when

16     was this directive put into place?

17     A    It was put into place in January 20 of 2016.

18     Q    So would this directive have been in effect in 2017?

19     A    Yes.

20     Q    And does this directive apply to all DOCCS facilities?

21     A    Yes.

22     Q    And can you please just describe generally how an

23     incarcerated individual utilizes the Incarcerated Grievance

24     Program?

25     A    Every DOCCS correctional facility has what we call a

**Seguin - Direct**

1   grievance office or an Incarcerated Grievance Resolution

2   Committee, IGRC office.  Incarcerated individual that wishes to

3   file a grievance can submit a written complaint to the grievance

4   or IGRC office at the facility, and that initiates the grievance

5   process.

6   Q    Now, you mentioned it I believe, but who does an

7   incarcerated individual initially submit a grievance to?

8   A    It would be the IGRC clerk or the IGP supervisor at the

9   correctional facility that they're housed in.

10  Q    And when should an incarcerated individual receive a

11  decision on a grievance they submit?  Is there a time frame?

12  A    It's dependent upon the allegations that are contained in

13  the grievance complaint.  If it's a grievance complaint that

14  follows -- that doesn't allege any type of staff misconduct or

15  sexual abuse, sexual harassment, those grievances would be heard

16  by the IGRC committee at the facility within 16 calendar days of

17  the grievance being filed.

18  Q    Now, you just mentioned I believe staff misconduct; is that

19  right?

20  A    Correct.

21  Q    And how are those grievances handled differently than

22  grievances that do not involve staff misconduct?

23  A    Grievances that involve staff misconduct, when they are

24  received in the IGRC office and filed, they are immediately

25  forwarded to the facility superintendent.  They don't receive an

**Seguin - Direct**

1    IGRC hearing.  And once the superintendent receives that

2    grievance complaint, they have 25 calendar days to conduct an

3    investigation and render a response.

4    Q    Is there a reason for that?

5    A    The reason is based on the allegations contained in those

6    types of complaint.  The IGRC is comprised of incarcerated

7    individuals and staff, and based on the allegations in staff

8    misconduct, we as a grievance program and as a department and at

9    the facility take those very seriously.  And so to keep

10   incarcerated individuals that are not involved out of the

11   process, we forward it directly to the superintendent of the

12   facility.

13   Q    Now, for the sake of completeness, can you describe what

14   the next step in the grievance process would be assuming that

15   the grievance was not related to staff misconduct?

16   A    If it was not a staff misconduct complaint, after the IGRC

17   hearing, the incarcerated individual who filed the complaint

18   would receive a response.  They have seven calendar days to

19   appeal that decision to the superintendent of the facility.  The

20   superintendent then has 20 calendar days to render a response,

21   and then they would receive that response.  If the incarcerated

22   individual wanted to further appeal, they would have seven

23   calendar days to appeal to CORC or the Central Office Review

24   Committee, which is the office that I work in.

25   Q    Now, does the appeal that you just mentioned to the

**Seguin - Direct**

1    superintendent, does that go directly from the incarcerated

2    individual to the superintendent, or does it go to someone else

3    before it gets to the superintendent?

4    A    Any appeal, whether it's an appeal of the IGRC to the

5    superintendent or appeal of the superintendent to CORC, has to

6    be submitted to the IGRC at the facility where the grievance was

7    filed.

8    Q    Now, I believe that you just mentioned it, but what is the

9    next step if an incarcerated individual receives a decision from

10   the superintendent that they are unhappy with?

11   A    They have the opportunity to appeal that decision to CORC

12   or C-O-R-C.

13   Q    What is CORC?

14   A    CORC is -- we are the final appellate level or the

15   administrative appellate level of the grievance program.   CORC

16   is a committee that's comprised of representatives of the

17   different deputy commissioners' offices for the executive team

18   for the Department of Corrections.

19   Q    Can you just explain how an appeal gets to CORC?

20   A    When the appeal is submitted to the IGRC at the facility,

21   they put together what we call a CORC packet.   The front of that

22   packet is basically just an overview of the grievance, provides

23   the grievance number, the incarcerated individual who filed it,

24   their department identification number, the title, and the dates

25   at each level of review, and then a summary of each step of

**Seguin - Direct**

1    review, the grievance, and the response.  It includes the

2    grievance complaint itself, all of the responses at each level

3    of review, and any investigation materials that were used to

4    render a response at the facility level for that grievance.

5    Q    Now, what happens once CORC receives that packet that you

6    just described?

7    A    When we receive it, it's date stamped in, and it's logged

8    into our computer database for tracking purposes.  Once it's

9    ready to be scheduled for CORC, it is then given to one of our

10   professional staff to conduct an initial review for the CORC

11   members to make sure all of the information contained therein is

12   appropriate and accurate, to obtain any additional information

13   that may be needed to answer the grievance appeal.  They draft a

14   proposed disposition, a CORC response, and then that decision is

15   put into a meeting for the CORC members to review and decide

16   upon the appeal.

17   Q    And is there any time frame within which CORC is to render

18   a decision on an incarcerated individual's appeal?

19   A    Directive 4040 stipulates we have 30 calendar days from the

20   date we receive the appeal.

21   Q    And is CORC the final level of appeal for an incarcerated

22   individual?

23   A    Yes.

24   Q    There's nothing higher?

25   A    Not within the Department of Corrections, no.

Seguin - Direct

1    Q    Okay.  Now, how does an incarcerated individual learn of

2    the Incarcerated Grievance Program and how to use it?

3    A    Every incarcerated individual when they are received at a

4    DOCCS correctional facility, whether they're a new reception or

5    they're someone that's being transferred to a new facility, goes

6    through what we call an orientation.  During that orientation,

7    there is a representative from grievance at the orientation that

8    goes over the grievance process with them at that particular

9    facility.  There's also a copy of Directive 4040 in every

10   grievance office throughout the state and also in the law

11   library at every DOCCS correctional facility throughout the

12   state.

13   Q    I believe you just touched on it, but what does this

14   orientation consist of?  Is it a class?  Are materials

15   distributed?

16   A    It's usually dependent upon the correctional facility, but

17   oftentimes it's the incarcerated individuals are in a room, and

18   then different representatives from different areas of the

19   facility will come in and provide information regarding that

20   particular area, that correctional facility.

21        Inmates are also given what's called like an inmate

22   orientation manual, which is an orientation manual for that

23   particular facility that kind of outlines the basics of the

24   different areas of the facility.  Also gives them contact

25   information if they have a question regarding a specific area or

**Seguin - Direct**

1  specific item, who in that particular facility they would

2  contact.

3  Q    And every incarcerated individual that enters DOCCS custody

4  receives that orientation at some point in time?

5  A    Yes.

6  Q    Does an incarcerated individual receive that orientation

7  every time they're transferred?

8  A    If they're transferred to a new facility for them.  So if

9  they've never been at that facility before, they would receive a

10  facility orientation, yes.

11  Q    To your knowledge, does Clinton Correctional Facility have

12  such an orientation program?

13  A    Yes.

14  Q    Now, are mitigating circumstances ever considered in the

15  context of an incarcerated individual's grievance filing?

16  A    Yes.

17  Q    In what situations are those considered?

18  A    The normal operations of grievances, an incarcerated

19  individual has 21 calendar days from whenever the alleged

20  incident is to file a grievance.  They have up to 45 calendar

21  days to file a grievance if they can provide mitigating

22  circumstances surrounding why they couldn't initially file

23  within that 21 calendar days.

24  Q    Whose responsibility is it to set forth the existence of

25  any mitigating circumstances?

**Seguin - Direct**

1  A    The incarcerated individual would provide those mitigating

2  circumstances when they submit the grievance complaint to the

3  IGRC office.

4  Q    Now, as part of the IGP, does CORC maintain its own

5  records?

6  A    We do.

7  Q    What kind of records does CORC maintain?

8  A    We have basically two different types of records.  The

9  first type would be the actual physical folder.  The CORC

10  packets are mailed to us through the mail.  So all of the paper

11  copies of the file, we keep the prior four calendar years and

12  the current calendar year.

13       We also have an electronic database that maintains overview

14  information of each grievance complaint.  So whatever we would

15  get on that front page of the CORC packet and a copy of the CORC

16  disposition.

17  Q    Where are those records maintained?  Is there a central

18  office?

19  A    They're maintained in central office.  We have what's

20  called a SharePoint database.

21  Q    Are those records categorized in any way?

22  A    We file them.  The physical files are filed according to

23  facility.  The electronic records are -- it depends on how

24  you're going to be searching for them.

25  Q    If you need a specific record, is there any way for you to

**Seguin - Direct**

1   search that database?

2   A    It's based on the grievance number.  We can search for that

3   particular grievance number, or if it's a request to see if a

4   particular incarcerated individual filed a grievance regarding

5   an issue, we can search by that incarcerated individual's DIN

6   number.

7   Q    Now, are you familiar with the plaintiff Charles Little in

8   this case?

9   A    Just based on preparation for the testimony today, yes.

10  Q    Are you familiar with his name and his DIN number

11  specifically?

12  A    I've seen it before.  I don't know his DIN number off the

13  top of my head, no.

14  Q    Did you ever perform any type of search of your database

15  for Mr. Little's name and DIN number?

16  A    I did, yes.

17  Q    Why did you perform that search?

18  A    It was at the request of the Attorney General's Office.

19  Q    I'd like to show you what's been marked as Defendant's

20  Exhibit 2.  If you could turn to that page in your binder.

21          MR. WHITE:  Judge, I will represent to the Court that

22  Defendant's Exhibit 2 has been stipulated to by the parties and

23  would move to enter it into evidence at this time.

24          THE COURT:  Any objection?

25          MR. BANKS:  No objection.

**Seguin - Direct**

1            THE COURT:  Receive Defendant's 2 in evidence.

2            MR. WHITE:  Thank you, Your Honor.

3   Q    Do you recognize this document, Defendant's Exhibit 2,

4   Ms. Seguin?

5   A    I do, yes.

6   Q    What is this document?

7   A    The first page is the active cases for DIN number 14A0447

8   that were received at CORC.  It looks like the subsequent pages

9   is a list of the closed cases that were received at CORC for

10  incarcerated individual, DIN number 14A0447.

11  Q    Is this the search that you just referenced running in

12  response to a request from the Attorney General's Office?

13  A    Yes.

14  Q    From your review of Defendant's Exhibit 2, did plaintiff

15  appeal any grievance related to allegations of assault at

16  Clinton Correctional Facility that took place on May 25 of 2017?

17  A    No, they do not.

18  Q    From your review of Defendant's Exhibit 2, how many appeals

19  had the plaintiff filed when you ran the search?

20  A    There were a total of eight.

21  Q    Do you know when you ran the search?

22  A    The date at the bottom of the exhibit is cut off.  So I

23  can't.

24        MR. WHITE:  I have no further questions.  Thank you very

25  much, Ms. Seguin.

Seguin - Cross

| 1 | THE COURT:  Cross-examine. |

**CROSS-EXAMINATION BY MR. BANKS:**

Q    Good morning, Ms. Seguin.  My name is Steven Banks.  I'm an attorney representing the plaintiff in this matter, Charles Little.  I just have a few follow-up questions, if I may.

I just want to be clear.  In 2017, your office was located in central office?

A    Yes.  We are central office, yes.

Q    And that's in Albany, New York?

A    Correct.

Q    Your job responsibilities presumably don't take you to Clinton Correctional Facility?

A    Not on a routine basis.  If there's a site visit or a reason why I need to go there, then I would, but not on a routine basis, no.

Q    Now, during your testimony a short time ago, you talked about the procedure for complaints about staff misconduct; is that correct?

A    Correct.

Q    And that's referred to in Exhibit D1, the Directive 4040 as harassment grievance; is that correct?

A    Yes.

Q    And you discussed the alternate procedure, if I can use that term.  A harassment grievance goes to the superintendent from its filing; is that correct?

**Seguin - Cross**

1   A    Yes.

2   Q    If I could direct you back to Exhibit D1, Defendant's 1,

3   the directive itself, and specifically to Section 7018.  Do you

4   have that in front of you?

5   A    I do.

6   Q    Is it correct when the superintendent receives a harassment

7   grievance, the superintendent has to make a determination

8   whether the grievance represents a bona fide case of harassment;

9   is that correct?

10  A    Correct.

11  Q    And then under this directive, the superintendent then is

12  required, if it is a bona fide harassment grievance, to initiate

13  an investigation; is that correct?

14  A    Correct.

15  Q    And the options on this document in Section 7018,

16  superintendent may initiate an in-house investigation, correct?

17  A    Correct.

18  Q    But it is also correct that the superintendent may also

19  initiate an investigation by the Office of Special

20  Investigations; is that correct?

21  A    Correct.

22  Q    Or alternatively, the superintendent, if he or she

23  determines that criminal activity is involved, may request an

24  investigation by the New York State Police; is that correct?

25  A    Correct.

**Seguin - Cross**

1    Q    And the Office of Special Investigations, is that a unit of

2    central office?

3    A    It is, yes.

4    Q    I also just want to touch upon the appeal process.  So I

5    just want to be clear on this.  If an inmate wishes to appeal

6    the results of the -- or a determination by the inmate -- the

7    IGRC, he may file an appeal, correct?

8    A    Correct.

9    Q    And that appeal is filed with the IGRC clerk?

10   A    Yes.

11   Q    Correct.  Then if the inmate wants to again appeal a

12   determination of the superintendent, he files an appeal to CORC,

13   the Central Office Review Committee.  He files his appeal with

14   the IGRC clerk at his facility as well?

15   A    Correct.

16   Q    Just talking about plaintiff in this matter, Charles

17   Little.  You've never met Charles Little, have you?

18   A    I have not, no.

19   Q    Do you know -- do you have any personal knowledge whether

20   he drafted a grievance concerning employee misconduct in May of

21   2017?

22   A    I do not, no.

23   Q    Do you have personal knowledge concerning his efforts to

24   submit such a grievance to the grievance clerk at Clinton

25   Correctional Facility?

**Seguin - Cross**

1    A    I do not, no.

2    Q    You don't have any personal knowledge concerning any effort

3    by Mr. Little to have such a grievance heard by the

4    superintendent or the Central Office Review Committee, correct?

5    A    No, I don't have any knowledge of that.

6    Q    And you do not have any personal knowledge concerning any

7    action by correction officers at Clinton to prevent that

8    grievance from being filed; is that correct?

9    A    That's correct.  I do not have any knowledge.

10             MR. BANKS:  Thank you.

11             THE COURT:  Redirect?

12             MR. WHITE:  No redirect, Judge.  Thank you.

13             THE COURT:  Okay.  Thank you.  You may step down,

14    ma'am.

15             MS. OUIMET:  The defense calls Ms. Gregory, who is the

16    IGP supervisor.

17             THE CLERK:  Ms. Gregory, come right down this way.

18    Come right up here.  Please raise your right hand.  Please state

19    your name for the record.

20             THE WITNESS:  Christine Gregory.

21             THE CLERK:  Please spell your name for the record.

22             THE WITNESS:  C-h-r-i-s-t-i-n-e G-r-e-g-o-r-y.

23                        **CHRISTINE GREGORY,**

24      having been first duly sworn as a witness, was examined and

25                         testified as follows.

**Gregory - Direct**

1          THE CLERK:  Thank you.  You can take a seat right up

2    in the witness stand.  Just adjust the microphone, and please

3    speak clearly into it.

4          THE COURT:  Okay.  You may proceed.

5    **DIRECT EXAMINATION BY MS. OUIMET:**

6    Q    Could you please state your name again for the record?

7    A    Christine Gregory.

8    Q    Who is your employer?

9    A    New York State DOCCS.

10   Q    How long have you worked for DOCCS?

11   A    26 years.

12   Q    Where do you currently work?

13   A    Clinton Correctional Facility.

14   Q    What's your current title?

15   A    Inmate Grievance Program supervisor.

16   Q    Is that IGP supervisor for short?

17   A    Correct.

18   Q    How long have you held that role?

19   A    Since 2003.

20   Q    How long have you held that role at Clinton?

21   A    Since January of 2012.

22   Q    Prior to Clinton, where were you the IGP supervisor?

23   A    Upstate Correctional Facility.

24   Q    Did you have to undergo any kind of training to become the

25   IGP supervisor?

**Gregory - Direct**

1  A    It was basically on-the-job training.

2  Q    What are some of your general duties?

3  A    As the supervisor, I review the complaints that come into

4  the system.  I do the grievance appeals, the CORC appeals.  I

5  respond to status requests, and I supervise the Inmate Grievance

6  Program.

7  Q    What is the Incarcerated Grievance Program?

8  A    It's an avenue for the incarcerated individuals to be able

9  to present their issues or their complaints they have with

10 policies, rules, regulations of the facility, directives of

11 DOCCS itself, or any issues they may have with staff or programs

12 at the facility.

13 Q    How do incarcerated individuals learn of the Incarcerated

14 Grievance Program?

15 A    They attend a facility orientation.

16 Q    At orientation, does the incarcerated individual receive a

17 handout regarding the Incarcerated Grievance Program?

18 A    Yes.

19 Q    Are they communicated -- is the procedure for filing a

20 grievance communicated to the incarcerated individual at

21 orientation as well?

22 A    Yes.

23 Q    If an incarcerated individual wants to grieve a particular

24 issue at Clinton, how would they go about doing that?

25 A    They would send their complaint through the interfacility

**Gregory - Direct**

1   mail to the IGP office.

2   Q    What happens to the grievance complaint once it gets to the

3   IGP office?

4   A    I would review it and determine if it was a timely issue.

5   And if it's a timely issue, then I would code it, title it,

6   process it.

7   Q    Was this the same procedure in 2017?

8   A    Yes.

9   Q    Does the grievance process apply to complaints of excessive

10  use of force?

11  A    Yes.

12  Q    Are there time constraints associated with filing grievance

13  complaints?

14  A    Yes.

15  Q    What are those time constraints?

16  A    The complaint has to be submitted within 21 calendar days

17  of the incident date.

18  Q    What happens if the grievance complaint is filed after the

19  21 days?

20  A    Then the incarcerated individual is advised to supply

21  mitigating circumstances.

22  Q    Could an incarcerated individual appeal the denial of a

23  grievance complaint if it was determined to be untimely?

24  A    There's no appeal process for that.

25  Q    How would they go about -- how would they go about getting

Gregory - Direct

1   that grievance in front of you as the IGP supervisor?

2   A    If a complaint is considered untimely, the incarcerated

3   individual can then file a grievance that the complaint was

4   considered untimely, and then that would go through the process

5   system.

6   Q    Is there any exceptions that an IGP supervisor can make to

7   the denial of a grievance complaint outside of the 21 days?

8   A    If it's sufficient mitigating circumstances.

9   Q    So if a grievance complaint is determined to be timely and

10  is filed within the 21 days, what happens next?

11  A    Then it would be processed based on the issue that's in the

12  complaint.

13  Q    What about that issue -- do different issues send the

14  complaint to different places?

15  A    Yes.

16  Q    Can you give me an example?

17  A    If an issue is a staff conduct grievance or harassment

18  grievance, that has an expedited process where once it's filed,

19  it goes to the superintendent level.

20  Q    Generally if there is a situation where an incarcerated

21  individual -- is there a situation where an incarcerated

22  individual can grieve directly to the superintendent level?

23  A    No.

24  Q    Where are records of grievances maintained at Clinton

25  Correctional Facility?

**Gregory - Direct**

1    A     In the IGP office.

2    Q     Are you the record custodian for those grievances?

3    A     Yes.

4    Q     Describe how the records are maintained by your office.

5    A     They're maintained for the present year plus the past four

6    years, and they are in numerical order by grievance number and

7    year.

8    Q     You previously testified that incarcerated individual has

9    21 days to file a grievance complaint before it is denied,

10   absent a written request for an extension.  When counting the

11   days available, do you begin your count from the date of the

12   incident?

13   A     Yes.

14   Q     What date is considered the file date?

15   A     The date it's issued a grievance number.

16   Q     Are grievance complaints that are denied by your office as

17   untimely maintained somewhere?

18   A     Yes.

19   Q     Where?

20   A     In the correspondence file.

21   Q     Generally, what is the correspondence file?

22   A     It's a file that's maintained with all the written memos to

23   the incarcerated individuals based on their questions in

24   correspondence to the IGP office.

25   Q     Besides memos, is there anything else contained in those

**Gregory - Direct**

1   correspondence files?

2   A     Memos that go with complaints that are considered untimely.

3   Q     Would a letter to you requesting a status update be put in

4   the correspondence file?

5   A     Yes.

6   Q     How long are correspondence files maintained in your

7   office?

8   A     The present year plus the past four years.

9   Q     So it's fair to say that any grievance or grievance

10  complaint received, whether filed or not, is maintained by the

11  Clinton grievance office for the present year plus the four

12  years prior?

13  A     Correct.

14  Q     Are you familiar with plaintiff Charles Little?

15  A     Only that he was an incarcerated individual at Clinton.

16  Q     Did there come a time that you reviewed plaintiff's

17  grievance files maintained at Clinton?

18  A     Yes.

19  Q     When was the most recent time you reviewed Mr. Little's

20  grievance file?

21  A     Approximately a week ago.

22  Q     Would you have been the person to receive a grievance

23  complaint if filed from Mr. Little regarding events at Clinton

24  on May 25, 2017?

25  A     Yes.

**Gregory - Direct**

1  Q    Would Mr. Little have had the opportunity to file such a

2  grievance after an incident on May 25, 2017?

3  A    Yes.

4  Q    And based on your search, did you find any evidence that

5  Mr. Little filed a grievance complaint regarding excessive force

6  that occurred on or about May 25 at Clinton?

7  A    No.

8  Q    So I'm going to have you turn to Exhibit 3.  It's the big

9  binder there, Defendant's Exhibit 3.

10          MS. OUIMET:  Judge, I would represent that Defendant's

11  Exhibit 3 has been stipulated by the parties and would ask that

12  it be entered into evidence.

13          MR. BANKS:  No objection.

14          THE COURT:  Receive Defendant's 3 in evidence.

15  Q    Ms. Gregory, do you recognize this document?

16  A    Yes.

17  Q    What is it?

18  A    It's a listing of the grievances filed by incarcerated

19  individual Little while at Clinton Correctional Facility.

20  Q    Based on your review of this document, how many grievances

21  did Mr. Little file in 2017?

22  A    Two.

23  Q    Are either of those grievances regarding excessive force

24  that occurred on May 25, 2017?

25  A    No.

**Gregory - Direct**

1   Q    If Mr. Little had written a letter to the IGP supervisor

2   attempting to appeal a lack of response to a grievance

3   complaint, would that letter be in a file as well?

4   A    Yes.

5   Q    Have you -- what file would that have been?

6   A    Correspondence file.

7   Q    Have you reviewed plaintiff's correspondence file?

8   A    Yes.

9   Q    Was there any correspondence from the plaintiff to you

10  concerning grievances within this claim?

11  A    Yes.

12  Q    What about for appealing, appealing a grievance for lack of

13  response?

14  A    No.

15  Q    So I'm going to have you turn to Defendant's Exhibit 6.

16          MS. OUIMET:  Judge, again I would represent

17  Defendant's Exhibit 6 has been stipulated by the parties and

18  would move to have it entered into evidence.

19          THE COURT:  Any objection to 6?

20          MR. BANKS:  No objection, Your Honor.

21          THE COURT:  Receive Defendant's 6 in evidence.

22  Q    Ms. Gregory, have you seen this letter before?

23  A    Yes.

24  Q    What's the date on this letter?

25  A    May 29, 2017.

**Gregory - Direct**

1  Q    Who is it from?

2  A    Incarcerated individual Charles Little.

3  Q    Is there a date received stamp on this letter?

4  A    No.

5  Q    Is this alleged grievance complaint signed as received by

6  your office?

7  A    No.

8  Q    What's the subject of the alleged grievance complaint?

9  A    It's an allegation of excessive use of force.

10  Q    Would a complaint of this nature, if received timely, be

11  considered a grievance regarding staff misconduct?

12  A    Excuse me?

13  Q    Would a grievance of this nature, if received timely, be

14  considered a grievance regarding staff misconduct?

15  A    Yes.

16  Q    And so would it have been expedited right to the

17  superintendent level?

18  A    Yes.

19  Q    What is the requested relief?

20  A    Medical care and that staff be disciplined.

21  Q    To your knowledge, was this grievance complaint ever

22  received by CORC?

23  A    No.

24  Q    Is there any indication in this grievance that it had been

25  received by the Clinton Correctional Facility grievance program

**Gregory - Direct**

1   supervisor?

2   A    No.

3   Q    I'm going to have you look at Defendant's Exhibit 10.

4           MS. OUIMET:   Again, Your Honor, I would represent that

5   Defendant's Exhibit 10 has been stipulated by the parties and

6   would move to have it entered into evidence.

7           THE COURT:   Mr. Banks?

8           MR. BANKS:   No objection, Your Honor.

9           THE COURT:   Receive Defendant's 10 in evidence.

10  Q    Ms. Gregory, have you received or have you seen this letter

11  before?

12  A    Yes.

13  Q    What is it?

14  A    It was a correspondence received from incarcerated

15  individual Little.

16  Q    What's the date on the letter?

17  A    The incarcerated individual dated it April 3, 2018.

18  Q    Is there a stamp showing that this letter was received by

19  you?

20  A    Yes.

21  Q    What's the date for that?

22  A    April 5, 2018.

23  Q    Can you tell me what the subject of this letter is?

24  A    That he is resubmitting a complaint as he claims he had

25  submitted it twice before and never got any answer from it.

**Gregory - Direct**

1    Q    To your knowledge, was this letter and the attached

2    grievance complaint ever received by CORC?

3    A    No.

4    Q    Is there any indication that it was received by Clinton's

5    IGP supervisor?

6    A    No.

7           MR. BANKS:  Objection, Your Honor.  We're talking

8    about this particular letter that's stamped, received, inmate

9    grievance supervisor?

10          THE COURT:  I think so.

11          MS. OUIMET:  Yes, Your Honor.

12          MR. BANKS:  I apologize.

13          THE COURT:  That's okay.

14    Q    I'll ask the question.  So is there any indication from

15    this letter that it was received by your office?

16    A    Yes.

17    Q    And once you received this letter, what did you do?

18    A    I responded to the incarcerated individual that it was an

19    untimely complaint.

20    Q    I'm going to have you turn to Defendant's Exhibit 11.

21          MS. OUIMET:  Your Honor, again I would represent that

22    this exhibit has been stipulated by the parties and would enter

23    to have it moved -- would move to have it entered into evidence.

24          THE COURT:  Any objection?

25          MR. BANKS:  No objection, Your Honor.

**Gregory - Direct**

1          THE COURT:  Receive Defendant's 11 in evidence.

2    Q    Are you familiar with this document?

3    A    Yes.

4    Q    What is it?

5    A    It's a memo to the incarcerated individual Little advising

6    him that the complaint he submitted to the IGP office was

7    untimely, beyond the time frame.  So would not be filed.

8    Q    Did you receive any correspondence from Mr. Little after

9    you sent this memo?

10   A    No.

11   Q    Did you receive any correspondence from Mr. Little with

12   respect to requesting an exception to the time limit?

13   A    No.

14   Q    Did you consider mitigating circumstances with respect to

15   this memo?

16   A    No.

17   Q    For mitigating circumstances to be considered, does an

18   incarcerated individual need to make you aware of them?

19   A    Yes.

20   Q    Generally, how does that happen?

21   A    It's a case-by-case basis, what they supply.

22   Q    Would they send you a letter?

23   A    Yes.

24   Q    Did you receive a letter from Mr. Little regarding

25   mitigating circumstances in this case?

**Gregory - Cross**

1   A   No.

2   Q   So is it your testimony that the first time plaintiff filed

3   any complaint about the May 2017 events was on April 5, 2018?

4   A   Yes.

5   Q   Is it your testimony that when the grievance was denied as

6   untimely, plaintiff did not take any further action to appeal

7   the rejection?

8   A   Correct.

9           MS. OUIMET:  I have no further questions.

10          THE COURT:  Okay.  You may cross-examine.

11          MR. BANKS:  One second, Your Honor.

12  **CROSS-EXAMINATION BY MR. HORAN:**

13  Q   Good morning.  My name is Conor Horan.

14      Ms. Gregory, you said that on direct that part of your job

15  is to respond to status requests for grievances, correct?

16  A   Correct.

17  Q   You also testified that Mr. Little has a correspondence

18  file and that you have reviewed that file?

19  A   Correct.

20  Q   In that binder that's in front of you, if I could direct

21  your attention to Defense Exhibit 6.  I'm sorry.  Defendant's

22  Exhibit 7.  Sorry about that.

23      Now, have you seen this letter before?

24  A   No.

25  Q   This is a letter.  Can you tell just from looking at it the

**Gregory - Cross**

1  date of this letter?

2  A    The incarcerated individual dated it June 17, 2017.

3  Q    Who was this letter addressed to?

4  A    IGRC supervisor.

5  Q    Is that you at the time?

6  A    Yes.

7  Q    So this letter would have went to you?

8  A    Yes.

9  Q    In this letter, June 17, is that right after the grievance

10  complaint was filed, correct?

11  A    The date is after the complaint.  However, it was not

12  filed.

13  Q    Sorry.  I apologize.

14       After, but it's after that date of May 29?

15  A    Yes.

16  Q    And I don't know if you had the chance to read it.  It's a

17  short letter.  Essentially to the point, this letter is asking

18  if you have started the investigation?

19  A    Yes.  It's a status request.

20  Q    Thank you.  If I can direct your attention to Exhibit 8.

21  It's just the next one.  I will ask you very similar questions.

22  If you can tell the date of this letter as well?

23  A    Incarcerated individual dated it June 26, 2017.

24  Q    This is also addressed to you?

25  A    Correct.

**Gregory - Cross**

1   Q    So both these letters dated before the April -- let me just

2   double check.  I believe it's the 19th in 2018?

3   A    Yes.

4   Q    Thank you.  Now, I know you talked about the grievance

5   procedure and the orientation program at Clinton.  What is the

6   time frame for filing a grievance?

7   A    21 calendar days from the incident date.

8   Q    I apologize.  I know you already said that.  I'm just

9   clarifying.  If it is over 21 days, there is an ability for them

10  to still file the grievance, correct?

11  A    If they supply mitigating circumstances.

12  Q    Now, exhibit -- sorry.  Defense 7 that I just showed you,

13  if you had received a letter from an inmate asking about the

14  status of a grievance, a couple days after, I guess this is I

15  think a couple days after that 21 days.  This is 22, 23 days.

16  Would that be mitigating factors that he attempted to file and

17  you haven't seen it?

18  A    What I would advise him such as it was not received in the

19  office.  Submit it to me with mitigating circumstances, and it

20  would be reviewed.

21  Q    I'm sorry to bounce you around a bit.  If you wouldn't mind

22  flipping to Exhibit 1.  This is Directive 4040.

23       Under this directive, harassment grievances, those are

24  grievances that allege employee misconduct and to annoy,

25  intimidate, and harm an inmate; is that correct?

**Gregory - Cross**

1    A    Correct.

2    Q    That's from the policy?

3    A    From the directive, correct.

4    Q    From the directive, yes.

5         Now, if you had an instance a case where -- in your

6    experience, if you received a grievance where a correction

7    officer had allegedly physically assaulted, kicked, choked, or

8    punched repetitively an inmate, would that be classified as a

9    harassment complaint?

10   A    Yes.

11   Q    I know you said you are familiar with Clifton Little.  Have

12   you ever spoken with the plaintiff?

13   A    No.

14   Q    Do you have any personal knowledge of when he wrote this

15   grievance dated May 29?

16   A    No.

17   Q    Do you have any personal knowledge concerning his efforts

18   to submit his grievance complaint?

19   A    No.

20   Q    Do you have any personal knowledge concerning any action

21   that may or may not have been taken by a correction officer to

22   prevent him from filing his complaint?

23   A    No.

24            MR. HORAN:  No further questions.  Thank you.

25            THE COURT:  Redirect?

**19-CV-263**

1            MS. OUIMET:  No further questions, Your Honor.

2            THE COURT:  Thank you very much, ma'am.  You may step

3     down.

4            MR. WHITE:  The defense has no further witnesses,

5     Judge.

6            THE COURT:  I'm sorry?

7            MR. WHITE:  The defense has no further witnesses.

8            THE COURT:  Any witnesses at this time from the

9     plaintiff?

10           MR. BANKS:  Your Honor, we do have a nonparty witness

11    that we agreed to accept.  He would provide testimony virtually

12    from New York City.  I understand it will take a few minutes to

13    get set up.  We're ready to proceed with that in particular.

14           THE COURT:  Okay.  It's 5 of 12.  About 12:10, does

15    that give you enough time?

16           THE CLERK:  Don't even need that much time.  The court

17    reporter indicated that would be good for her, 12:10.

18           THE COURT:  We will adjourn to 12:10.

19                      (Recess.)

20           MR. BANKS:  Your Honor, the plaintiff calls Matthew

21    Wasserman.

22           THE COURT:  Okay.

23           THE CLERK:  Mr. Wasserman, please raise your right

24    hand.  Please state your name for the record.

25           THE WITNESS:  Matthew Wasserman.

**Wasserman - Direct**

1            THE CLERK:  Please spell your name for the record.

2            THE WITNESS:  Sure.  Matthew is M-a-t-t-h-e-w.

3    Wasserman is W-a-s-s-e-r-m-a-n.

4                        **MATTHEW WASSERMAN,**

5      having been first duly sworn as a witness, was examined and

6            testified through videoconference as follows.

7            THE CLERK:  Thank you.

8            THE COURT:  Okay.  You may begin.

9            MR. HORAN:  Thank you, Your Honor.

10   **DIRECT EXAMINATION BY MR. HORAN:**

11   Q    Mr. Wasserman, how are you?

12   A    Good.  How are you?

13   Q    I'm good.  I'm going to ask you a few questions.

14        Mr. Wasserman, if you could briefly explain or detail the

15   schools you've attended, the education degrees you've received.

16   A    Sure.  I have a BA from Reed College I received in 2009.  I

17   have a master's from the Sorbonne University of Paris.  And then

18   I have a law degree from New York University School of Law.

19   Q    Thank you.  And where are you currently employed?

20   A    I am a criminal defense attorney with the Bronx Defenders

21   in New York City.

22   Q    Do you have any other legal experience?

23   A    I do.  I've had a few legal jobs.  I think most

24   pertinently, I was a staff attorney with the Office of the

25   Appellate Defender.

**Wasserman - Direct**

1  Q    Okay.  What were your responsibilities while working for

2  the Office of the Appellate Defender?

3  A    As a staff attorney, I was lead counsel on direct appeals

4  and also post conviction motions.  I would handle collateral

5  matters such as SORA hearings, trial court as well.  So what

6  that meant as a practical matter, I would be assigned a client.

7  I would read the record.  I would write briefs.

8  Q    Okay.  Throughout this experience, did you meet a man named

9  Charles Little?

10 A    I did.  Mr. Little was assigned to me as a client shortly

11 after I started there.

12 Q    Do you know the first time you came to learn about

13 Mr. Little?

14 A    First time I came to learn about him was when I was

15 assigned his case.  We corresponded by mail after that and also

16 spoke on phone.  I met him in person I believe two times.

17 Q    Okay.  Can you very briefly describe what your role was in

18 providing him legal services?

19 A    Sure.  So I was assigned appeal.  So that meant that I read

20 the record.  I filed a brief.  In Mr. Little's case, we also

21 conducted a factual reinvestigation to investigate claims of

22 actual innocence.  I did not prepare the post conviction motion,

23 the 440, but I did handle the facts of the investigation that

24 led to the filing of a 440 after I left the office.  I was the

25 attorney who prepared the brief and argued the direct appeal to

**Wasserman - Direct**

1    the First Department.

2    Q    While you were representing Mr. Little, did he ever send

3    you any documents?

4    A    Yes.  He sent me many letters.

5    Q    When your office would receive a document or a letter from

6    a client such as Mr. Little, would you describe the general

7    process for how they would receive it, what they would do with

8    it?

9    A    Yes.  So whenever we received a letter, our office manager

10   would actually open the letter and stamp it with a date stamp.

11   And then after that happened, it would be placed in my mailbox.

12   Typically after I received a letter, I would personally scan it

13   in and keep it in an electronic case file.

14   Q    Okay.  I'm going to turn your attention to Plaintiff's

15   Exhibit 3, as soon as I can.  Now, are you familiar with this

16   letter?

17   A    Yes.  I have seen it before, although I must admit I don't

18   have an independent recollection of receiving it.

19   Q    Okay.  Are you familiar with the stamp on the top of the

20   letter?

21   A    Yes.  That is the stamp that our office manager would apply

22   to any letter we received.

23   Q    So this is the same stamp that was used in the Appellate

24   Defender's Office?

25   A    Yes, that is.

**Wasserman - Direct**

1  Q    Does every document received by the Appellate Defender's

2  Office receive a similar stamp?

3  A    Every letter from a client would receive that stamp.

4  Q    This stamp, I'm not sure if you can see it that well.  This

5  stamp, can you tell what the date on that is?

6  A    Yes.  It says June 8, 2017.

7  Q    Which means it was received by the Appellate Defender's

8  Office on June 8?

9  A    Yes.

10  Q    Is there any reason to believe that this document was not

11  received by the Appellate Defender's Office on June 8?

12  A    Not that I know of.

13  Q    Now, if you can, I apologize.  I'd like you to read the

14  letter from Mr. Little, and I'll ask if you recall receiving it.

15  A    So having read the letter, I have no independent

16  recollection of receiving it.  I do remember receiving many

17  letters from Mr. Little.  I just don't remember this specific

18  one.

19        MR. HORAN:  Your Honor, at this time, I'd like to put

20  this or offer to put this letter into evidence.

21        THE COURT:  Any objection?

22        MS. OUIMET:  No, Your Honor.

23        THE COURT:  Received.  That's Plaintiff's 3?

24        MR. HORAN:  Plaintiff's 3.

25        THE COURT:  Received.

**Wasserman - Direct**

1   Q    So do you know what the purpose of this letter was?  I know

2   you don't have the recollection.  I'm sorry.  I'm just zooming

3   in so you can read more of it.

4   A    So it seems like he was informing me of several things that

5   were happening and also enclosing a copy of a grievance he had

6   filed or attempted to file.

7   Q    And what was the date of the grievance that he had

8   enclosed?

9   A    So I would have to actually look at the grievance to say

10  that.  It doesn't seem like it says it in the letter itself.

11  Q    Okay.  Do you know the date of this letter?

12  A    The letter is dated May 29.

13  Q    Did you take any action when you received this letter?

14  A    So I don't have an independent recollection of what I did

15  in response to this letter.  I did notice when I was reading

16  that that he asked me to email a copy to his wife and also to

17  send him back a copy.  I don't recall whether I did either of

18  those things, but I typically would have done those things had a

19  client requested me to do so.

20  Q    Did you reach out to Clinton facility at all, Clinton

21  Correctional Facility?

22  A    No, I did not.  Not in relation to the grievance in any

23  case.

24  Q    Does the letter ask you to?

25  A    Does not.

**Wasserman - Cross**

1              MR. HORAN:  No further questions.

2              THE COURT:  Cross.

3    **CROSS-EXAMINATION BY MS. OUIMET:**

4    Q    Hi, Mr. Wasserman.  Can you hear me?

5    A    I can.

6    Q    Okay.  In May of 2017, you were a staff attorney with the

7    Office of the Appellate Defender, correct?

8    A    That's correct.

9    Q    And as such, you frequently represented incarcerated

10   individuals in their appeals, right?

11   A    Yes.

12   Q    And one of those incarcerated individuals was Clifton

13   Little, correct?

14   A    That is correct.

15   Q    You were involved in Mr. Little's case while he was

16   confined in Clinton Correctional Facility, right?

17   A    Yes.  I believe he was also confined in other facilities,

18   but one of the facilities he was confined in while I represented

19   him was Clinton.

20   Q    During this time, Mr. Little would write you letters from

21   Clinton, correct?

22   A    That is correct.

23   Q    You received a letter from plaintiff Little on June 8,

24   2017, correct?

25   A    Yes.  As I said, I don't have an independent recollection

**Wasserman - Cross**

1    of receiving it, but I'm viewing that letter, and it's

2    consistent with the letters I do remember receiving from him.

3    Q    Plaintiff requested you make copies of the grievance

4    attached to the May 29, 2017, letter, correct?

5    A    That is correct.

6    Q    Plaintiff asked you to send a copy of the grievance via

7    email to his wife, right?

8    A    That's correct.

9    Q    Plaintiff requested you send copies of the grievance back

10   to him also, correct?

11   A    Yes.

12   Q    Plaintiff was requesting copies of the grievance because

13   his hands hurt, right?

14   A    That's what it says in the letter.

15   Q    I'll move it down.  He couldn't physically keep writing

16   copies of the grievance, correct?

17   A    Can you move the letter down a little bit more?

18   Q    Is that better?

19   A    Yes, thank you.  Yes.  I don't think he specifically says

20   that he couldn't continue writing copies of the grievance, but

21   he definitely did ask me to make copies.  He did say his hands

22   hurt.

23   Q    Plaintiff wanted copies of the grievance to send to the

24   Inmate Grievance Program supervisor, right?

25   A    So I don't know why he wanted copies.  As I mentioned, if

**Wasserman - Cross**

1    he asked me to send him a copy, I would have done so as part of

2    my normal practice.

3    Q    You didn't send plaintiff copies of his grievance, did you?

4    A    I have no independent recollection of whether I did send

5    him copies or not.

6    Q    You responded to plaintiff's letter that you received, the

7    June 8, 2017, letter, you responded to him on July 12, 2017,

8    correct?

9    A    So when I read the letter dated July 12, it looked like I

10   was actually following up on a legal call I had scheduled with

11   him.  It very may well have been the next letter I sent him.

12   That, I don't know.

13         MS. OUIMET:  Your Honor, if it's okay, I would like to

14   show the witness what has been marked as Defendant's 15.  The

15   parties have stipulated to it.  I ask it be moved into evidence.

16         THE COURT:  13?

17         MS. OUIMET:  15.

18         MR. HORAN:  No objection.

19         THE COURT:  Receive Defendant's 15 in evidence.

20   Q    Is that your signature at the bottom?

21   A    That is.

22   Q    This is the Office of the Appellate Defender's letterhead

23   at the top, correct?

24   A    That is correct.

25   Q    In July of 2017, you were a staff attorney at the Office of

**Wasserman - Cross**

1    the Appellate Defender, correct?

2    A    That is correct.

3    Q    Your letter responding to plaintiff makes no mention of

4    including copies of the grievance, correct?

5    A    That is correct.

6    Q    You didn't send copies of the grievance to Mr. Little with

7    this letter, correct?

8    A    Not with this letter, no.

9    Q    Aside from receiving Mr. Little's letter on June 8, 2017,

10   you have no idea whether plaintiff actually filed the grievance

11   dated May 29, 2017, right?

12   A    That's correct.

13   Q    You do not know if plaintiff attempted to mail the

14   grievance on May 29, 2017, right?

15   A    Yes.

16   Q    You do not know whether plaintiff followed up with the

17   grievance, correct?

18   A    That is correct.

19   Q    In fact, aside from receiving the grievance itself, you

20   were not involved in plaintiff's grievance process in 2017 at

21   all, correct?

22   A    That is correct.

23         MS. OUIMET:  I have no further questions.

24         THE COURT:  Redirect?

25         MR. HORAN:  Yes, Your Honor.

**Wasserman - Redirect**

1   **REDIRECT EXAMINATION BY MR. HORAN:**

2   Q    Mr. Wasserman, I'm going to show you again the letter

3   that's marked as Defendant's Exhibit 3 -- 15.  This is the

4   letter that you wrote to Clifton Little?

5   A    That's correct.

6   Q    What was the purpose of this letter?

7   A    I was following up on a legal call I had scheduled with

8   Mr. Little.  I was also letting him know about the application

9   for leave to appeal that I had submitted to the New York Court

10  of Appeals.

11  Q    So in this letter, you do not mention the May 29 grievance

12  complaint?

13  A    That is correct.

14  Q    Why not?

15  A    Well, there's a couple reasons.  One is I had already

16  spoken with him on the phone based on this letter after the

17  May 29 letter, but perhaps more importantly, I just didn't get

18  involved with grievances that my clients filed.  It was outside

19  the scope of representation, and quite frankly, we didn't have

20  the resources to really get involved.

21  Q    So aside from receiving Mr. Little's previous letter --

22  sorry, Plaintiff's Exhibit 3, that was your only involvement in

23  the grievance procedure?

24  A    That's correct.

25         MR. HORAN:  No further questions.

**19-CV-263**

1          THE COURT:  Anything further?

2          MS. OUIMET:  Nothing further.

3          THE COURT:  Okay.  I guess that ends the presentation

4    of the state material.  What is further from the plaintiff?

5    Anything at this time?

6          MR. BANKS:  Your Honor, at this time, we would ask for

7    an adjournment to accommodate the testimony of Charles Little,

8    the plaintiff in this matter.

9          THE COURT:  Okay.  Well, we talked about that before.

10   I think the Court concluded that it was appropriate under the

11   circumstances to give you an adjournment to present the evidence

12   from the plaintiff, should he decide to participate.  And so

13   we're going to set that date down for July 14 of this year,

14   10:30 a.m. in Albany, New York.  So the hearing is continued to

15   that day.

16          Anything further from the plaintiff's counsel?

17          MR. BANKS:  Nothing further, Your Honor.  Thank you.

18          THE COURT:  Defense counsel?

19          MR. WHITE:  No, Your Honor.  Thank you very much.

20          THE COURT:  Okay.  Well, thank you, everybody, for

21   your presentations.  I'll take the matters I heard into

22   consideration, and we'll see what happens with the plaintiff,

23   what he decides to do next.  Court stands adjourned in this

24   matter.

25                    (The matter adjourned at 12:21 p.m.)

**19-CV-263**

1                          INDEX TO WITNESSES

2      DEFENDANTS:              DIRECT      CROSS     REDIRECT   RECROSS

3      James Stewart            7           13

4      Jason Holland            18          26

5      Rachael Seguin           31          44

6      Christine Gregory        48          60

7      PLAINTIFF:               DIRECT      CROSS     REDIRECT   RECROSS

8      Matthew Wasserman        65          70        74

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**19-CV-263**

1                    CERTIFICATION OF OFFICIAL REPORTER

2

3

4          I, JACQUELINE STROFFOLINO, RPR, CRR, Official Court

5   Reporter, in and for the United States District Court for the

6   Northern District of New York, do hereby certify that pursuant

7   to Section 753, Title 28, United States Code, that the foregoing

8   is a true and correct transcript of the stenographically

9   reported proceedings held in the above-entitled matter and that

10  the transcript page format is in conformance with the

11  regulations of the Judicial Conference of the United States.

12

13          Dated this 19th day of July, 2022.

14

15          **/s/ JACQUELINE STROFFOLINO**

16          JACQUELINE STROFFOLINO, RPR, CRR

17          FEDERAL OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25